**Guadalupe JIMENEZ et al.**

v.

**HIDALGO COUNTY WATER IMPROVE-MENT DISTRICT NO. 2 et al.**

**Civ. A. No. 72–B–171.**

United States District Court,
S. D. Texas,
Brownsville Division.

Oct. 2, 1975.

American Civil Liberties Union Foundation (Melvin Wulf, Joel Gora and Burt Neuborne), New York City, and American Civil Liberties Union Foundation, South Texas Project, David G. Hall, San Juan, Tex., for plaintiffs.

Atlas, Hall, Schwarz, Mills, Gurwitz & Bland, Morris Atlas and Harry L. Hall, McAllen, Tex., for defendants Hidalgo County Water Improvement Dist. No. 2, Its Officers, Directors and Manager.

Smith, McIlheran, McKinney & Yarbrough, Garland F. Smith, of Weslaco, Tex., for defendants Hidalgo and Cameron Counties Water Control and Imp. Dist. No. 9, and Its Directors.

Ewers, Toothaker, Ewers, Abbott, Talbot, Hamilton & Jarvis, R. Glenn Jarvis and Neil Norquest, McAllen, Tex., for amicus curiae Donna Irrigation Dist., Hidalgo County Number One.

Neal P. King, Mission, Tex., for amici curiae Water Districts.

### MEMORANDUM AND ORDER

Before GEE, Circuit Judge and GARZA and COX, District Judges.

GEE, Circuit Judge:

This suit is brought by plaintiff Guadalupe Jimenez and thirteen other named plaintiffs, former residents of defendant Hidalgo County Water Improvement District No. 2 or defendant Hidalgo and Cameron Counties Water Control and Improvement District No. 9, against certain directors of the two defendant water districts, in their official capacities only. Plaintiffs sue for a class comprising all those persons whose lands have been excluded from the defendant water districts without actual personal notice to the owners thereof, or persons in possession of such lands and who do not want their lands excluded from the defendant water districts.

Plaintiffs seek an injunction setting aside the January 1973 water district elections and ordering defendants to hold new elections in each of defendant water districts, since by reason of the exclusion of their lands from such districts plaintiffs were unable to vote in the January water district elections and will be unable to vote in future water district elections. In addition, they would have this court enjoin defendants from excluding "urban property" as defined in Article 8280–3.2, Tex.Rev.Civ.Stat.Ann., from the corporate boundaries of the defendant water districts and would have this court declare both that Article 8280–3.2 is unconstitutional on its face and as applied to them and the class they represent and that the action of defendants in excluding "urban property" pursuant to such statute is null and void and of no effect at law.

Jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343, 2201 and 2202; upon 42 U.S.C. § 1983; and upon the Fifth and Fourteenth Amendments to the Constitution of the United States. This three-judge court was convened by order of the United States Court of Appeals for the Fifth Circuit. *Jimenez v. Hidalgo County Water Improvement District No. 2*, 496 F.2d 113 (5th Cir. 1974).

The facts of this case are stipulated and have been found by this court to be as stipulated.

Defendant water districts are political subdivisions of the State of Texas, similar to municipalities and other special-purpose districts governed by state statutes. The two districts were organized pursuant to Article 16, § 59 of the Texas Constitution and are governed by Chapter 51 of the Texas Water Code. The

state legislature has delegated to such water control and improvement districts the authority to administer the state's water resources by means of their respective water rights. Water districts have been granted broad powers to effectuate their purposes, e. g., the power of eminent domain, the power to acquire property, the power to tax for certain purposes, the power to borrow money and issue bonds, the power to make contracts and engage in large-scale construction projects, and the power to hire numerous employees to implement the goals of the district and enforce district regulations. *See* generally Chapter 51, Texas Water Code. In essence, water districts have been endowed by the legislature with all powers necessary to carry out their purposes. Each district operates through a board of directors, each of whom must own land within the district.

Plaintiffs herein complain of the exclusion of their lands from the defendant districts. A preliminary examination must therefore be made of the procedure used in excluding such lands. Article 8280–3.2, Tex.Rev.Civ.Stat.Ann., the statute challenged in this lawsuit, reads, in pertinent part, as follows:

> Art. 8280–3.2 Water Control improvement districts; exclusion of urban property
>
> Section 1. As used in this Act:
>
> (a) "Urban property" means land which has been subdivided into town lots, or town lots and blocks, or small parcels of the same general nature of town lots, or town blocks and lots, designed, intended or suitable for residential or other non-agricultural purposes, as distinquished from farm acreage, including streets, alleys, parkways, parks and railroad property and right-of-ways in such subdivision; whether such subdivision be within or near any established city, town or village, or not; and whether or not a plat or map of such subdivision has been duly filed for record and recorded in

the office of the county clerk of the county in which such subdivision or any part thereof is situated. Urban property shall not be deemed to include land, which is or has been within one year previous to the date of the hearing hereinafter provided, used for farming or agricultural purposes.

> (b) "District" means any water control and improvement district now existing or hereafter created for the principle purpose of, or principally engaged in, furnishing water for the irrigation of agricultural lands and having no outstanding bonded indebtedness owing by such water control and improvement district at the time of the hearing hereinafter provided, or having indebtedness only in connection with a loan from an agency of the United States, provided written consent from an authorized representative of the agency of the United States involved to the proposed exclusion hereunder is on file with the district prior to the time of the hearing hereinafter provided.
>
> Sec. 2. Urban property located within the boundaries of a district may be excluded from such district by the Board of Directors after a hearing by the Board of Directors called and held as hereinafter set forth.

Provision is then made for hearing and notice which will be hereinafter discussed.

### Preamble

■■ The alteration of the boundaries of political subdivisions by the state is a political function entirely within the power of the state legislature to regulate. This principle was enunciated by the Supreme Court in 1907, in the case of *Hunter v. City of Pittsburgh*, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151. The Court stated, at pages 178 and 179, 28 S.Ct. at page 46:

> Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising

such of the governmental powers of the state as may be entrusted to them. For the purpose of executing these powers properly and efficiently they usually are given the power to acquire, hold, and manage personal and real property. The number, nature, and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the state. . . . The state, therefore, at its pleasure, may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States. Although the inhabitants and property owners may, by such changes, suffer· inconvenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason, they have no right, by contract or otherwise, in the unaltered or continued existence of the corporation or its powers, and there is nothing in the Federal Constitution which protects them from these injurious consequences. The power is in the state, and those who legislate for the state are alone responsible for any unjust or oppressive exercise of it.

In *Detroit Edison Co. v. East China Township School District*, 378 F.2d 225 (6th Cir.), *cert. denied,* 389 U.S. 932, 88 S.Ct. 296, 19 L.Ed.2d 284 (1967), the court held that any alteration of municipal boundaries was completely discretionary with the State and not confined by any rights secured by the federal Constitution. The Fifth Circuit Court of Appeals, in affirming a case appealed from this court, has stated that in regard to annexations: "[T]he annexation of lands to a city has been held without exception to be purely a political matter entirely within the power of the State Legislature to regulate." *Hammonds v. City of Corpus Christi*, 343 F.2d 162, 163 (5th Cir.), *cert. denied,* 382 U.S. 837, 86 S.Ct. 85, 15 L.Ed.2d 80 (1965). *See also Deane Hill Country Club, Inc. v. City of Knoxville*, 379 F.2d 321 (6th Cir.), *cert. denied* 389 U.S. 975, 88 S.Ct. 476, 19 L.Ed.2d 467 (1967). It is therefore clear that the power of of political subdivisions of states, such as municipalities and water districts, to alter their boundaries, is almost absolute as far as the federal Constitution is concerned.

### Gerrymandering

Plaintiffs, however, first object to the exclusion of their urban areas pursuant to state law as a political gerrymander. At the outset they characterize their line of attack generally: "[T]he Defendants denied Plaintiffs equal protection of the law by fencing them out of the electorate for political reasons." In the body of their argument the attack is sharpened and particularized:

Article 8280–3.2 has, in effect as well as purpose, countenanced a political gerrymander.[1] Here the gerrymander is not directed solely to a class defined by race or national origin, but rather it is directed against a class of urban residents—a class which poses a threat to Defendants' irrigation programs when presented in the form of bond elections and a class which poses a threat to Defendants' continued political control of the Districts. As Mr. Justice Frankfurter observed in *Go-*

---

1. It should be borne in mind that plaintiffs' basic attack is on the Texas statute, it being agreed by all that the statutory procedure for exclusion was correctly followed.

*million v. Lightfoot,* 364 U.S. 339, at 347, [81 S.Ct. 125, 130, 5 L.Ed.2d 110] (1960):

> While in form this is merely an act redefining metes and bounds, if the allegations are established, the inescapable human effect of this essay in geometry and geography is to despoil colored citizens, and only colored citizens, of their theretofore enjoyed voting rights.

By substituting "urban" for the word "colored" in that statement, Justice Frankfurter described the Defendants' actions here. (footnote added).

Finally, the argument is rounded out by analogy to such authorities as *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) and *Evans v. Cornman,* 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970), involving manipulation of state residency requirements to deny the general franchise to servicemen or to residents of federal enclaves. Through the position is ingenious, we are not persuaded.

The summons to us, in the name of *Gomillion,* to pursue the gerrymander into the depths of the political thicket is one which has been often ignored [2] or declined [3] by the Supreme Court: the trumpet has not given even an uncertain sound, it has lain all but mute. And *Gomillion,* which might once have appeared the thin entering wedge of the amendments into state gerrymandering, with the Fifteenth shortly to be joined in the breach by the Fourteenth, etc., has suffered a different fate. In its more recent expressions, the Court has seemed to see the case more as a specific instance of the general invalidity of racially-motivated official actions than as one primarily concerned with the gerrymander. It has, for example, not been four months since Mr. Justice White, writing for the Court in a case involving an annexation attacked as racially motivated, cast *Gomillion's* effect as follows:

> An official action, *whether an annexation or otherwise,* taken for the purpose of discriminating against Negroes on account of their race has no legitimacy at all under our Constitution or under the statute. Section 5 [of the Voting Rights Act of 1965, 42 U.S.C. § 1973c] forbids voting changes taken with the purpose of denying the vote on the grounds of race or color. Congress surely has the power to prevent such gross racial slurs, the only point of which is "to despoil colored citizens, and only colored citizens, of their theretofore enjoyed voting rights." *Gomillion v. Lightfoot,* 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L. Ed.2d 110 (1960). Annexations animated by such a purpose have no credentials whatsoever; for "[a]cts generally lawful may become unlawful when done to accomplish an unlawful

---

2. E. g., although political gerrymandering was an issue and was discussed by the district court in *Graves v. Barnes,* 343 F.Supp. 704, 734 (W.D.Tex.1972), the Supreme Court failed to even mention the question in affirming in part and reversing in part, *White v. Register,* 412 U.S. 755, 93 S.Ct. 2332, 37 L. Ed.2d 314 (1973).

3. In *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), a somewhat diffuse spray of cold water was made to play on the complaints there made of political gerrymandering. See text discussion at 412 U.S. 751–54, 93 S.Ct. 2330–32, 37 L.Ed.2d 311–13, and footnote 18, *loc sit,* remarking:

> Appellees also maintain that the shapes of the districts would not have been so

"indecent" had the Board not attempted to "wiggle and joggle" boundary lines to ferret out pockets of each party's strength. That may well be true, although any plan that attempts to follow Connecticut's "oddly shaped" town lines (App. 98) is bound to contain some irregularly shaped districts. But compactness or attractiveness has never been held to constitute an independent federal constitutional requirement for state legislative districts. Cf. *White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335; *Wright v. Rockefeller,* 376 U.S. 52, 54, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), and id., at 59–61, 84 S.Ct., at 606–608 [11 L.Ed.2d 512] (Douglas, J., dissenting).

end . . . ." *Western Union Tele-
graph Company v. Foster,* 247 U.S. 105,
114, 38 S.Ct. 438, 439, 62 L.Ed. 1006, [1
A.L.R. 1278] (1918); *Gomillion v.
Lightfoot, supra,* 364 U.S., at 347, 81
S.Ct., at 130. [5 L.Ed.2d 110]. An
annexation proved to be of this kind
and not proved to have a justifiable
basis is forbidden by § 5, whatever
its actual effect may have been or
may be. (emphasis added.)
*City of Richmond v. United States,* 422
U.S. 358, 378, 95 S.Ct. 2296, 2307–08, 45
L.Ed.2d 245, 260 (1975). Nor is this
development of *Gomillion,* if such it be,
surprising, for the opinion itself makes
plain that it dealt with something over
and beyond "familiar abuses of gerry-
mandering." [4]

■■ Here we face, at worst, such
a familiar abuse. Were we to accept
in full plaintiffs' view of defendants'
actions—that they represent a politicized
drawing of boundaries having as its aim
precisely and nothing but the perpetua-
tion in power of the dominant body in a
state political subdivision—plaintiffs
would confront nothing that minority
political bodies have not faced in the
South and elsewhere, from time im-
memorial.[5] That the practice is odious
and unfair is too patent to require dis-
cussion; we take it as granted. But
much in the political process is, or may
be made, unfair, and we hold no general
warrant to correct inequity. The United
States and all state Constitutions con-

template representative, rather than
town-meeting, government in the legisla-
tive branch. So long as this is so it will
be possible that the views of any minori-
ty in any given political subdivision will
go unrepresented, except insofar as the
sense of fairness of the representative
elected by the dominant faction moves
him to give it voice and effect. One
such view will be on how boundaries of
political subdivisions should be drawn,
and into the opposing views on this ques-
tion will doubtless sometimes enter un-
fortunate considerations of maximizing
the voting power of some political blocs
and dispersing that of others on a ter-
ritorial basis—gerrymandering. But,
though *Gomillion* [6] teaches that this
may not be done on racial grounds,
courts have stood abashed before its ac-
complishment on others, finding no con-
stitutional tool to apply and, perhaps,
fearing that judicial intrusion so near
the heart of the political process would
be a desperate remedy worse than the
disease.

Nor do such cases as *Carrington* [7] or
*Cornman* [8] aid plaintiffs' case, for they
are clearly distinguishable. Each in-
volves denial of the franchise to persons
who are to remain *within* and *subject* to
the political entity in which they seek
to vote. And Mr. Justice Marshall, writ-
ing for the Court in *Cornman,* places
the Court's decision that Maryland could
not deny the franchise to domiciliaries
of a federal enclave squarely on the basis

4. 364 U.S. at 341, 81 S.Ct. at 127.

5. In posing the hypothetical—and it is only
a hypothetical, we make no finding—we have
in mind the alleged intentions of the districts'
directors, who, by their actions, excluded the
plaintiffs' land. Courts do not presume that
state legislatures have acted in bad faith.
Nor does the intent of the legislature in-
validate otherwise constitutional legislation.
*Palmer v. Thompson,* 403 U.S. 217, 91 S.Ct.
1940, 29 L.Ed.2d 438 (1971); *United States
v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20
L.Ed.2d 672 (1968); *Fletcher v. Peck,* 10
U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810).
The same rule applies here.

6. And a myriad voting rights cases, such as
*Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct.
2321, 37 L.Ed.2d 298 (1973); *Wright v.
Rockefeller,* 376 U.S. 52, 84 S.Ct. 603, 11
L.Ed.2d 512 (1964); *Gilbert v. Sterrett,* 509
F.2d 1389 (5th Cir. 1975); *Cousins v. City
Council of the City of Chicago,* 466 F.2d
830 (7th Cir.), *cert. denied,* 409 U.S. 893,
93 S.Ct. 85, 34 L.Ed.2d 151 (1972).

7. *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct.
775, 13 L.Ed.2d 675 (1965).

8. *Evans v. Cornman,* 398 U.S. 419, 90 S.Ct.
1752, 26 L.Ed.2d 370 (1970).

of the broad powers exercised over the domiciliaries and their property by Maryland. The core of his opinion centers on the trial court's finding that the plaintiffs ". . . are treated by the State of Maryland as state residents to such an extent that it is a violation of [the Equal Protection Clause of] the Fourteenth Amendment for the State to deny them the right to vote." [9] Our plaintiffs, to the contrary, are not part of or subject to the water district excuding them at all, for by the act of exclusion it renounced all power over them or their property. Plaintiffs' claim is beyond our warrant, and their invitation to rewrite *Gomillion*—and the Fifteenth Amendment—to read "urban" for "race" or "color" must be declined. Such a revision is beyond our competence and, if to be taken in hand by judges, must be by those from whose decisions there is no appeal.

### Sufficency of Constructive Notice

A major issue in this case is one of the sufficiency of notice. Plaintiffs' argument rests largely upon the fact that each individual plaintiff and members of the class plaintiffs represent did not receive personal notice of the hearings concerning exclusion of their lands from the districts. Article 8280–3.2, the statute plaintiffs herein attack, sets forth the requirements for notice prior to exclusion of lands from a water district. It has been stipulated between the parties that the provisions of Article 8280–3.2 were complied with by both districts. Plaintiffs contend, however, that Article 8280–3.2 notice is insufficient. This court does not agree.

Section 3 of Article 8280–3.2 provides for the adoption of a resolution by the board of directors of a water district calling for a hearing to determine whether or not all or part of any urban property shall be excluded from the district.

The resolution is to set forth a description of the property to be excluded, and the date, time and place such hearing is to be held.

The notice provisions of Article 8280–3.2 are as follows:

Sec. 4. It shall be the duty of the Board of Directors to cause notice of such hearing to be given by posting a true copy of the resolution referred to in the preceding section at the courthouse door of the county in which such district or any portion thereof is situated, at a location in or near the urban property proposed for exclusion, and also in a conspicuous place in the principal office of the district for at least three (3) weeks before the date of such hearing. The date, time, place and purpose of such hearing shall also be advertised by publishing notice thereof one time in one or more newspapers giving general circulation in the district, such publication to be at least ten (10) days prior to the date of hearing. In the event railroad right-of-way is involved herein, notice shall be given to the railroad company by mailing, first class, a true copy of the same, properly addressed to the offices of the railroad at the address as it appears on the last approved county tax roll.

The statute proceeds to provide that such a hearing may be continued from time to time until all persons who appear and are entitled to be heard have been heard and that thereafter the board of directors shall determine and find,[10] before excluding it, that such urban property is not used or intended to be used for agricultural purposes, that it would be in the best interest of the district and of the urban property to exclude such property and that the owners of a majority in acreage of such urban property do not desire irrigation of their property.

---

9. 398 U.S. at 424–25, 90 S.Ct. at 1756, 26 26 L.Ed.2d 376.

10. As it did in this case, findings which are not attacked before us.

**676**

Plaintiffs contend that Article 8280–3.2 is unconstitutional on its face because it does not provide for notice to each individual landowner affected by the exclusion of urban property, that it creates a favored class as regards notice, i. e., the railroad, and that plaintiffs, who are largely of Mexican-American descent, should have received not only individual notice but notice in the Spanish language.

Notice of the type required by Article 8280–3.2 is the type provided for in almost all states when personal notice is not required. Examples of some proceedings in Texas of which notice may be given by publication or posting or both are: (1) the annexation of additional territory by drainage districts or conservation and reclamation districts, Tex. Rev.Civ.Stat.Ann. art. 8176b; (2) the creation or extension of navigation districts, Texas Water Code Ann. § 61.028; (3) the annexation or deannexation of territories by cities, Tex.Rev.Civ.Stat. Ann. art. 970a §§ 6 and 10, subd. C; (4) the creation of fresh water supply districts, Texas Water Code Ann. §§ 53.016 to 53.019, inclusive; and (5) the exclusion of lands from fresh water supply districts, Texas Water Code Ann. § 53.-233.

Reasons for choosing the method of notice provided in Article 8280–3.2 are manifest. For example, within Hidalgo County Water Control and Improvement District No. 2, a defendant herein, there are some 2,061 property owners owning more than one acre of land in the district. If landowners in excluded areas are entitled to notice, certainly the remaining landowners would be entitled to notice also, as their property would be subjected to greater taxes because of the decreased area. There are approximately 2,958 owners of lots in the excluded areas. Personal notice to all landowners in both English and Spanish would mean that some 10,000 notices to over 5,000 owners would have to be sent. A similar problem would confront defendant District No. 9.

▮▮▮ In fixing the boundaries of political subdivisions,

[T]he legislature has power to fix such a district for itself without any hearing as to benefits, for the purpose of assessing upon the lands within the district the cost of a local public improvement. The legislature, when it fixes the district itself, is supposed to have made proper inquiry, and to have finally and conclusively determined the fact of benefits to the land included in the district, and the citizen has no constitutional right to any other or further hearing upon that question.

*Fallbrook Irrigation District v. Bradley,* 164 U.S. 112, 174–75, 17 S.Ct. 56, 69, 41 L.Ed. 369, 394 (1896). *See also Chesebro v. Los Angeles County Flood Control District,* 306 U.S. 459, 59 S.Ct. 622, 83 L. Ed. 921 (1939). As the aforementioned cases indicate, plaintiffs have not suffered and will not suffer a loss of constitutional dimensions, and therefore the quantum of notice to be afforded plaintiffs will be gauged accordingly. Plaintiffs' reliance on such cases as *Schroeder v. City of New York,* 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962), *Walker v. City of Hutchinson,* 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956), and *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), is misplaced. Each of those cases involved an existing, tangible property interest, as opposed to what here seems to be at best an intangible, possible future interest of undetermined nature. Notice similar to the notice provided for in Article 8280–3.2, i. e., by publication, has routinely been upheld in cases concerning the formation of water districts. *Orr v. Allen,* 245 F. 486 (N.D.Ohio 1917), *aff'd,* 248 U.S. 35, 39 S.Ct. 23, 63 L.Ed. 109 (1918); *San Saba County Water Control & Improvement*

*District No. 1 v. Sutton,* 12 S.W.2d 134 (Tex.Comm'n App. 1929, jdgmt. adopted); *Tarrant County Water Control & Improvement District No. 1 v. Pollard,* 118 Tex. 138, 12 S.W.2d 137 (1929). *See also Rutledge v. State,* 117 Tex. 342, 7 S.W.2d 1071 (1928).

 This court, therefore, holds that the personal notice to landowners of the exclusion of lands from a water control and improvement district is not required and, therefore, that the notice provisions of Article 8280–3.2 are constitutional.

### Equal Protection: Actual Notice to the Railroads

Plaintiffs also contend that the notice provision of Article 8280–3.2 is unconstitutional in that it denies them equal protection of the laws. They point to the provision of the statute which allows them to be notified of the exclusion proceedings constructively but requires that railroads be given actual notice by mail. This, they say, creates categories and treats them differently.

 There is, of course, no doubt that Texas, in exacting the notice provision of Article 8280–3.2, chose to treat the railroads differently from other persons, both real and corporate. But neither the creation of categories nor differentiations in treatment are *per se* violations of the Equal Protection Clause. Even when suspect categories or fundamental rights are involved, a state may treat different groups differently if there exists a compelling governmental interest in doing so. And when, as here, the legislation attacked involves neither fundamental rights [11] nor classifications based upon suspect criteria, it will be sustained unless it discriminates invidiously or unless the classification and differing treatment bears no rational relationship to a permissible state objective. *See Schilb v. Kuebel,* 404 U.S. 357, 364–65, 92 S.Ct. 479, 30 L.Ed.2d 502 (1971). The discrimination between railroads and all others is by no means invidious. Moreover, since an obvious objective of the notice provision of Article 8280–3.2 is to insure that all interested parties have a reasonable opportunity to be apprised of the potential exclusion of their property from a water control and improvement district, there is certainly strong justification for providing for special notice to railroads. Railroads run from coast to coast and throughout Texas. Each of some 254 counties in Texas contain numerous political subdivisions, school districts, cities and other agencies of the state capable of affecting the railroads' interest through taxes or otherwise. For a railroad company covering a large area, the task of acquainting itself with the activities of a multitude of state and local agencies would be monumental. Thus, it was rational for the Texas Legislature to suppose that in order for the railroads to be apprised of local happenings they, more than local residents or landowners, would need actual notice. And it was permissible for it to provide that such notice be given them.

Having dealt with plaintiffs' contentions, we conclude that the relief sought by them must be denied.

---

11. The right to vote is, of course, fundamental, but the statute does not concern itself with classification and voting but rather with classification and notice of local legislative proceedings. There is no fundamental right for all to receive notice of each happening within the political sphere.