Louis V. CASERTA, Milton L. Gaasland,
and all others similarly
situated, Plaintiffs,

v.

The VILLAGE OF DICKINSON,
Defendant.

Civ. A. No. G–77–153A.

United States District Court,
S. D. Texas,
Galveston Division.

June 9, 1980.

Stuart M. Nelkin, Nelkin & Nelkin, Houston, Tex., for plaintiffs.

Jonathan S. Day, Butler, Binion, Rice, Cook & Knapp, Houston, Tex., James R. Ansell, County Atty. of Galveston County, Galveston, Tex., Robert Randolph Jespersen, Houston, Tex., for defendant.

## MEMORANDUM OPINION

HUGH GIBSON, District Judge.

### I. *Background of the Case*

Civil Action No. G–77–153 was originally filed on September 30, 1977. Named plaintiffs sought to void an incorporation election of August 13, 1977 in which a majority of voters voted in favor of incorporating the Village of Dickinson, Texas. Named plaintiffs alleged on their behalf, and on behalf of all other similarly situated, violations of: the Voting Rights Act of 1965, 42 U.S.C. § 1973; 42 U.S.C. § 1983; the Fourteenth Amendment to the United States Constitution; and the Fifteenth Amendment to the United States Constitution. Plaintiffs also alleged pendent jurisdiction

of a claim arising under Texas state law to void the incorporation election for failure to comply with Texas law, particularly Tex. Rev.Civ.Stat.Ann. art. 970a, § 8 A (1963).

Following an evidentiary hearing, the cause was certified as a class action pursuant to Rule 23, Fed.R.Civ.P. On December 18, 1979 the Court ordered certain named plaintiffs dismissed and modified the class subdivisions to include two subclasses:

(1) Class One to be composed of all those registered voters residing within Galveston County Water Control and Improvement District (WCID # 1) but outside of the proposed village boundaries; and

(2) Class Two to include those registered voters residing within WCID # 1 and within the proposed boundaries.

A temporary injunction was issued on December 5, 1977 and subsequently modified to maintain the status quo prior to the incorporation election pending a trial on the merits. The Village of Dickinson, its Mayor and Aldermen were specifically restrained from collecting taxes, accepting payments in lieu of taxes and issuing or selling bonds or certificates of obligation.

Finding severable and distinct questions of law applicable to the case, the Court issued an Order of Severance on January 27, 1978. The order directed that those questions covered under the Voting Rights Act of 1965 were more properly before a three-judge court. Questions not concerned with the Voting Rights Act were found properly before a single judge. The cause now before this Court as Civil Action G–77–153A consists of the class action of named plaintiffs Caserta and Gaasland against defendant Village of Dickinson.[1] All other defendants previously named in this cause have been duly dismissed prior to trial.[2]

---

**1.** Pursuant to court order, defendant Village of Dickinson's counterclaim alleging loss of tax revenue and cost of legal fees resulting from plaintiffs' temporary injunction was severed from this cause of action to avoid confusion.

**2.** Plaintiffs' complaint originally named three additional defendants:

1. Laurence Kelly was a petitioning party on the application for incorporation and an alleged supporter and spokesperson for the incorporation of the Village of Dickinson. Mr. Kelly's motion to dismiss was granted March 29, 1978 because no relief sought in plaintiffs' amended complaint went to Mr. Kelly, a private citizen.

The civil action now before this Court for consideration is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth and Fifteenth Amendments to the Constitution of the United States. This Court has jurisdiction over the matters asserted pursuant to 28 U.S.C. § 1343.

Plaintiffs contend that the boundaries of the Village of Dickinson as drawn by those petitioning for incorporation are defective on both constitutional and state law grounds. It is the plaintiffs' position that the boundaries of the proposed Village were consciously drawn in a fashion to impermissibly exclude from within the proposed incorporated Village substantial areas of Black, Mexican-American and poor citizens who have historically been deemed an integral part of the "natural community of Dickinson." Plaintiffs contend that identifiable minority groups have been excluded from the Village boundaries and the voting strength of those minorities left within the proposed boundaries diluted in a constitutionally impermissible type of gerrymander. Plaintiffs also contend that under a pendent state law claim the proposed incorporation of the Village of Dickinson was and is void *ab initio* for failure to comply with the limitations prescribed by Texas law, specifically Tex.Rev.Stat.Ann. art. 970a § 8 A (1963). Plaintiffs seek a determination by this Court that the incorporation election of August 13, 1977 be declared null and of no effect; that elections of municipal officers subsequent to the incorporation election be declared void; and that this Court enter an order for the redrawing of the Village boundaries in compliance with constitutional standards.

The Village of Dickinson contends that the boundaries of the incorporated Village of Dickinson were drawn pursuant to population and area parameters established by Texas state law, applying legitimate and constitutionally permissible policy considerations. The Village asserts that the incorporators of Dickinson did not intend to, nor do the boundaries of the incorporated Village have the effect of, violating any right secured by the Constitution of the United States. Defendant Village also contends that all necessary releases of extraterritorial jurisdiction were obtained from the adjoining municipalities making the incorporation of Dickinson valid under all relevant Texas statutes. Accordingly, the defendant argues that the boundaries of the incorporated Village and the election establishing them should be upheld in this proceeding.

## II. Federal Issues—Fourteenth and Fifteenth Amendments

On August 13, 1977 a referendum election on the question of incorporation was held in Dickinson, Texas. The Dickinson community is no novice to the incorporation question; evidence adduced at trial indicates at least six incorporation attempts preceded the August 1977 election. Utilizing a village concept rather than incorporating under a city plan, pro-incorporators were able to persuade a majority to incorporate the Dickinson area as a village.[3]

Plaintiffs allege that the Village of Dickinson's incorporation has wrought a deprivation of Fourteenth and Fifteenth Amendment rights. Plaintiffs claim the arbitrary utilization of a village concept in the Dickinson area has worked to produce a political as well as racial gerrymander; that at least one-half of the minority population was "fenced out" of the Village; and that the exclusion of minorities necessarily led to

---

2. Ray Holbrook, County Judge in Galveston County, Texas, was responsible for the incorporation election procedures. On plaintiffs' motion Judge Holbrook was dismissed as a defendant on March 29, 1980.

3. Galveston County is the political subdivision that includes both the incorporated and unincorporated areas in question. Galveston County was also dismissed on plaintiffs' motion made March 29, 1980.

3. Certified election results produced at trial show the total number of votes cast in the August 1977 election to have been 1809. Those voting for village incorporation numbered 940 and those opposed to incorporation numbered 860, the voting margin being only 71 votes favoring incorporation. Considering plaintiffs' contention that village planners sculptured the village limits to insure success, the results were hardly overwhelming.

the dilution of minority voting strength within the Village.[4]

▮ Plaintiffs' thrust throughout the presentation of evidence centered on the apparent effect of minority exclusion from within the incorporated Village boundary. The record is replete with evidence demonstrating that the northwesterly Village boundary drawn along State Highway 3 had the effect of excluding approximately one-half of a predominantly Black area known as Moore's Addition. Less exacting evidence was adduced to indicate that an area known as Nickelstone,[5] which contains a segment of the Mexican-American community as well as other high ethnic concentrations, was to a large degree excluded from the Village boundaries. What the record lacks is a marshaling of virtually any evidence to prove the necessary elements of either a Fourteenth or Fifteenth Amendment claim: intent or racially motivated and purposeful discrimination. *City of Mobile, Alabama v. Bolden*, —— U.S. ——, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980).[6] This basic void in the plaintiffs' proof compels this Court to find plaintiffs' Fourteenth and Fifteenth Amendment claims without merit. Although recognizing the Fourteenth and Fifteenth Amendment claims to be separate and distinct, the Court will analyze them in tandem since the factual finding is substantially determinative of both.

The Fifteenth Amendment does not confer the right of suffrage upon anyone. Rather it prohibits discrimination in the exercise of voting based upon race, color or previous conditions of servitude. *United States v. Reese*, 92 U.S. 214, 217–218, 23 L.Ed. 563 (1875). This basic tenet of the Fifteenth Amendment was broadened somewhat in *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). In that case the Court held that allegations of a racially motivated gerrymander of municipal boundaries stated a claim under the Fifteenth Amendment. Cases following *Gomillion v. Lightfoot* set forth the principle that racially discriminatory purpose or motivation is a necessary ingredient of a Fifteenth Amendment violation. *Wright v. Rockefeller*, 376 U.S. 52, 56–58, 84 S.Ct. 603, 605–606, 11 L.Ed.2d 512 (1964); *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978).

Underlying plaintiffs' Fourteenth Amendment burden of proof is the basic principle that only if there is purposeful discrimination can there be a violation of the Equal Protection Clause of the Fourteenth Amendment. *See, Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The burden of proof carried by the plaintiffs here is consistent in both claims of constitutional deprivation. Disproportionate effect alone will not establish either

---

**4.** It should be noted that while plaintiffs' pleadings and arguments are deluged with claims of racial discrimination, at the time of trial all minority named plaintiffs had been dismissed from the suit. At least two of the original minority plaintiffs testified at trial that their knowledge of the progression of the lawsuit and their participation in it prior to their dismissal was limited to newspaper accounts. While the Court is reluctant to denominate the suit as a taxpayer suit traveling under the guise of citizens concerned with civil rights as the defendant claims, it believes these additional factors to be noteworthy when considered in light of other evidence, or lack thereof, adduced at trial.

**5.** The evidence running even to the effect the Village boundaries had on the area known as Nickelstone is far from concrete. Witnesses were diverse as to their opinion of exactly

where the entire Nickelstone area was and what ethnic group composed the majority of Nickelstone residents.

**6.** Plaintiffs asserted in opening argument that the jurisprudence was to that date unclear as to the burden of proof required in cases asserting violations of either the Fourteenth or Fifteenth Amendments. While not in agreement with plaintiffs at that time, the Court is sure that any grey area surrounding the burden of proof has been resolved by the recent Supreme Court decision of *City of Mobile v. Bolden*, —— U.S. ——, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). This recent case clearly delineates the high burden plaintiffs face in Fourteenth and Fifteenth Amendment assertions; specifically, plaintiffs must show racially motivated and purposeful discrimination. *Id.* at —— U.S. —— ———, 100 S.Ct. 1497, 1501.

claim[7] and plaintiffs' failure to meet their incumbent burden to prove racially discriminatory motive or purpose is determinative of the federal claims involved.

▆ Ordinarily, a state or political subdivision is constitutionally free to draw or redraw political boundaries in any manner it chooses. *Hunter v. City of Pittsburgh,* 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907).[8] The Dickinson boundaries must be examined in search of the invidious purpose behind the drawing of boundaries that *Gomillion v. Lightfoot* and its progeny condemn.[9]

The Dickinson community had a well defined record in previous incorporation attempts, all adverse to the concept of incorporating as a city. The evidence presented at trial demonstrated that pro-incorporators, fearful of impending annexation by the neighboring city of League City, decided to attempt one last incorporation effort. Pro-incorporators believed their weak spots of prior incorporation attempts to be the Dickinson community's adverse reaction to the ideas of big city government and potentially high city tax rates encompassed in earlier incorporation attempts.

Incorporation as a village seemed to be the answer to this adversity since the village concept provided for minimum government, set a ceiling on the allowable tax rate,[10] and afforded the majority of the Dickinson community refuge from League City annexation.

Once the decision had been made by Dickinson planners to attempt annexation as a village, inherent limitations were imposed by statute. Texas law provides for limitations both as to population and territory size to fit within the village system.[11]

---

**7.** In *Wright v. Rockefeller,* 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964) the Supreme Court failed to invalidate a New York districting plan which involved an eleven-sided irregular boundary, contoured closely to the geographic distribution of the races resulting in one district which excluded non-white and Puerto Rican citizens, who were largely concentrated in another district. The challengers did not prevail because they failed to prove that the legislature "was motivated by racial consideration," or that the statute involved "was the product of a state contrivance to segregate on the basis of race or place of origin." *Id.* at 56, 58, 84 S.Ct. at 605, 606. Such a heavy burden of proof is quoted approvingly in other contexts. *See, e. g.: Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252 at 265, 97 S.Ct. 555 at 563 (proof of racially discriminatory intent or purpose required to show Fourteenth Amendment violation in challenge to Village's rezoning decision); *Washington v. Davis,* 426 U.S. 229 at 240, 96 S.Ct. 2040 at 2047 (racially discriminatory motive required in challenge to police recruiting procedures brought under the Fourteenth Amendment).

**8.** Recognizing that states may not be omnipotent, the Supreme Court in *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, held that while boundary drawing is ordinarily a political function, the state or its political subdivisions do not have the power to do as they will with municipal incorporations regardless of the consequences. The Court found this to be particularly true where the consequence is the impairment of voting rights cloaked in the garb of the realignment of political subdivisions. 364 U.S. at 345, 81 S.Ct. at 129.

**9.** The Supreme Court has repeatedly cited *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) in both Fourteenth and Fifteenth Amendment contexts for the principle that an invidious racially discriminatory claim must be adduced to support a claim of unconstitutionality. *See, City of Mobile, Alabama v. Bolden,* —— U.S. ——, ——, 100 S.Ct. 1490, 1497, 64 L.Ed.2d 47 (1980); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1966); *Wright v. Rockefeller,* 376 U.S. 52, 56, 84 S.Ct. 603, 605, 11 L.Ed.2d 512 (1964).

**10.** Tex.Rev.Civ.Stat.Ann. art. 1146 provides in pertinent part: "The board of aldermen shall: 1. Have power to levy and collect . . . taxes on persons and property, real and personal, within the corporation, subject to taxation by the laws of this State; but the tax on persons and property shall not, in any one year, exceed the rate of one-fourth of one percent on the one hundred dollars valuation. . . . "

**11.** Tex.Rev.Civ.Stat.Ann. art. 1133 (1963) provides in pertinent part: "When a town or village contains more than two hundred (200) and less than ten thousand (10,000) inhabitants, it may be incorporated as a town or village in the manner prescribed." Tex.Rev.Civ.Stat.Ann. art. 971 (1963) provides in pertinent part: "No city or town in this State shall be hereafter incorporated under the provisions of the general charter for cities and towns contained in this title with a superficial area of . . . more than nine square miles, when such city or town has more than five and less than ten thousand

Planners for the Village were forced to plan metes and bounds of the proposed village to meet the limitations of nine square miles and an initial population of under ten thousand persons.

With the inception of the village concept it was clear to the steering committee that the entire water district (WCID # 1) was too large to meet the village specifications. Evidence shows that through informal meetings with Mayor Lowery of Texas City, village planners were apprised of Texas City's intentions not to release any of the fashional suburban area within its jurisdiction south of Dickinson Bayou. It was clear from the earliest stages that the entire WCID # 1 could not be included in the Village.[12]

As in any municipal planning, multiple factors played a part in the determination of the Village boundaries. The evidence demonstrates the main considerations for the village concept choice over the city plan were the minimum cost needed for a village's operation and the guaranteed low tax base dictated by Texas law under a village plan. Neither consideration rises to the invidious purposes proscribed by either *Gomillion v. Lightfoot* or *Washington v. Davis* to substantiate the Fourteenth and Fifteenth Amendment claims. Plaintiffs' claims that the village concept was utilized to gerrymander along either racial or political lines is simply not supported by the evidence.

Once the village concept was chosen with area and population limits, the metes and bounds description was shown at trial to be the product of many considerations, some of which were: the desire of planners to take into the Village the heart of "old downtown Dickinson" including the business district; an attempt to take in the most heavily populated area of Dickinson while at the same time maintaining some areas for potential growth; the representations made by Texas City that the suburban area south of Dickinson Bayou would not be released; an attempt to take in the majority of schools in the area, particularly the junior and senior high schools; to plan as much as possible along natural and topographic boundaries; and an attempt to keep future village expenses to a minimum. Clearly, none of these considerations insult any constitutional propriety.

Evidence adduced by plaintiffs as to racial motivations in the drawing of Village boundaries was the testimony of Charles Dunbaugh, Chairman of the Village of Dickinson Planning Commission. Mr. Dunbaugh testified that planners believed it important to ensure that the village boundary did not disproportionately exclude the Black community. This merely showed that the planners themselves were concerned with the effect the village boundary might have.[13] The only other evidence marginally favorable to plaintiffs on these matters was the testimony of their expert Richard Murray, Ph.D. However, Dr. Murray's testimony centered solely on the purported effect that he believed the boundaries as drawn could have on the minority community and not on intent.

Plaintiffs' repeated reliance on *Gomillion v. Lightfoot* warrants a short recitation for the sake of comparison. The gerrymander condemned in *Gomillion* was the redrawing of municipal boundaries so as to virtually fence out Black citizens and deprive them

---

inhabitants." Texas statutes demonstrate the Dickinson planners to have chosen the largest village plan possible under Texas law.

12. Plaintiffs contended throughout that any incorporation election "should" have included the entire boundary of WCID # 1. It must be noted that the Court is not concerned with what should, or might have been; its only concern being: Is the Village as it is abhorrent to constitutional requisites.

13. The Village of Dickinson submission of a population survey summary to the Justice Department in connection with its obtaining clearance under Section 5 of the Voting Rights Act shows that the village planners were unnecessarily concerned with fears of disproportionately excluding minorities. The statistics presented to the Department of Justice show that racial percentages of the Village are consistently within two percentage points of the racial make-up of WCID # 1. (See Defendant's Exh. 12).

of their pre-existing right to vote.[14] The Court in *Gomillion* dealt with an "uncouth" 28-sided figure, not the product of a routine political decision and unsupported by any neutral justifications. The facts presented to the Court on the incorporation of the Village of Dickinson are a far hue and cry from the Tuskegee gerrymander presented in *Gomillion*. Absent a pattern as stark as that presented in *Gomillion*, impact alone is not determinative, and action by the State or its political subdivision racially neutral on its face violates the Fourteenth and Fifteenth Amendments only if motivated by discriminatory purpose. *City of Mobile v. Bolden, supra,* —— U.S. at ——, 100 S.Ct. at 1497; *Wright v. Rockefeller,* 376 U.S. 52, 56–58, 84 S.Ct. 603, 605–606, 11 L.Ed.2d 512 (1963); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

Comment should be made that the evidence before the Court falls far short of even the applicable aggregate circumstances[15] utilized by the Fifth Circuit to delineate intent presented in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973) *en banc, aff'd sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).[16] There was no evidence that minorities were denied access to the process of slating candidates, in fact the evidence was to the contrary.[17] Equally lacking was any evidence that the existence of past discrimination in the Dickinson area in general precluded the effective participation of minorities in the election system.[18]

■ Peripherally treated by both parties but ever looming in the case is plaintiffs' claim of a general political gerrymander. *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973)[19] spoke to the problems of political gerrymander and its relationship to the Fourteenth Amendment.

**14.** Lack of a pre-existing right to vote as existed in *Gomillion* is only one of the glaring distinguishing features between it and Dickinson. While members in WCID # 1 had previously been permitted to vote, it was only in those instances where their property would have been included within the earlier proposed city boundaries and, as such, affected by an incorporation effort. Those not within the Village of Dickinson boundaries have merely maintained their status quo as members of Galveston County. The case in Dickinson is clearly analogous to the one presented in *Jimenez v. Hidalgo County Water Improvement District No. 2,* 68 F.R.D. 668 (S.D.Tex.1975) (3-judge court), *aff'd* 424 U.S. 950, 96 S.Ct. 1423, 47 L.Ed.2d 357 (1975) (mem.). In *Jimenez* plaintiff's property was excluded from the bounds of the water district, thereby rendering plaintiffs unable to vote in the elections, yet the court found "plaintiffs have not suffered and will not suffer a loss of constitutional dimensions." 68 F.R.D. at 676.

**15.** It is important to remember that *Zimmer v. McKeithen,* and the criteria it enumerated, centered around an apportionment scheme as well as the problems of at-large election schemes. Based on different fact patterns, obviously not all of the criteria enunciated in *Zimmer* are applicable to this fact pattern.

**16.** The Court is aware that the judgment of the Court of Appeals in *Zimmer v. McKeithen* was affirmed by the Supreme Court on grounds other than those relied upon by the Court of Appeals and explicitly "without approval of the constitutional views expressed by the [Fifth Circuit]." *East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 638, 96 S.Ct. 1083, 1085, 47 L.Ed.2d 296 (*per curiam*). This Court encompasses the *Zimmer* analysis only out of an abundance of caution, especially in light of the Supreme Court's recent decision in *City of Mobile, Alabama v. Bolden,* —— U.S. ——, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). A plurality of the court rejected the *Zimmer* analysis, holding that the primary, if not sole, analysis must focus on intent and that even an aggregate of the *Zimmer* criteria, "were most assuredly insufficient to prove an unconstitutionally discriminatory purpose." —— U.S. at ——, 100 S.Ct. at 1503.

**17.** Testimony from several members of the Black community indicated they themselves had run more than one time for elections to the Dickinson Independent School System and had encountered no problems in either getting on the ballot or conducting their campaigns.

**18.** Mr. Louis Gill, a Black member of the community on the Village of Dickinson Board of Aldermen, said he had been elected to office in the 1977 election and re-elected in the subsequent election. Each time the election was at large, and Mr. Gill had run in third and fourth place, respectively.

**19.** *See also, Jimenez v. Hidalgo County Water Improvement District No. 2,* 68 F.R.D. 668 (S.D.Tex.1975) (3-judge court), *aff'd* 424 U.S. 950, 96 S.Ct. 1423, 47 L.Ed.2d 357 (1975) (mem.).

That case involved a plan drawn with careful attention to voting habits. The court thought it idle "to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it." 412 U.S. at 752, 93 S.Ct. at 2331, and found district courts not to have the "constitutional warrant to invalidate a state plan . . . because it undertakes, not to minimize or eliminate the political strength of any group or party, but [merely] to recognize it." 412 U.S. at 754, 93 S.Ct. at 2332. The critical inquiry is whether the Village boundaries operated to minimize or cancel out the voting strength of any political element of the population. *See, Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Burns v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966). The evidence at trial showed that the voting districts in the Dickinson area are so large and encompass so many diverse areas in Dickinson that it is impossible to discover how any small area voted on any of either the previous incorporation attempts or the 1977 attempt under attack.[20]

The evidence fails to show that the Village of Dickinson either discriminated in the elective franchise on account of race or indulged in the type of racial or political gerrymander proscribed by constitutional mandate. Nor does the evidence show that the Village boundaries were drawn invidiously to minimize or cancel out the voting potential of racial or ethnic minorities. *See, Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). The Court is compelled to find plaintiffs' Fourteenth and Fifteenth Amendment claims

without merit since plaintiffs have fallen far short of meeting their burden of proof on the issues.

### III. *State Law Issues—Pendent Jurisdiction*

■ Plaintiffs allege that this Court has pendent jurisdiction of a state law claim that the proposed incorporation of the Village of Dickinson was and is, void *ab initio* for failure to comply with Texas law, specifically Tex.Rev.Stat.Ann. art. 970a § 8 A (1963).[21] Pendent jurisdiction is the theory by which a federal controversy might also, under certain circumstances, take cognizance of a similar, parallel or related state claim. *United States v. Armco Steel Corporation*, 333 F.Supp. 1073, 1079 (S.D.Tex. 1971). Requisites of pendent jurisdiction in the sense of judicial power were set forth in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The federal claim must have substance sufficient to confer subject matter jurisdiction on the court and the state and federal claims must derive from a common nucleus of operative facts. *Id.* at 725, 86 S.Ct. at 1138.

■ Only in the broadest sense are the federal and state claims in this action factually related: both causes of action arose out of the incorporation of the Village of Dickinson. It is difficult for the Court to state that the two claims arose from a common nucleus of operative facts when the facts offered as proof on the federal claim were so wholly separate and apart from those offered to challenge the incorporation on Texas statutory grounds and state policy.[22]

---

**20.** The only evidence produced at trial was that all previous elections under the city plan had been decided against incorporation, while the 1977 election under the village plan was decided in favor of incorporation.

**21.** Tex.Rev.Stat.Ann. art. 970a § 8 A (1963) provides in pertinent part: "No city may be incorporated within the area of the extraterritorial jurisdiction of any city without the written consent of the governing body of such city." Plaintiffs' claim that the corporate limits of the Village of Dickinson include some areas within

the extraterritorial jurisdiction of League City that were never released from League City.

**22.** The Fourteenth and Fifteenth Amendment claims centered around facts concerning the exclusion of persons from the Village boundaries, particularly minorities who lived in areas deemed within the natural community of Dickinson for racially discriminatory reasons. The state law claim centered around the overlap of the Village boundaries with League City's "unreleased" extraterritorial jurisdiction in contravention of Texas law as well as the Texas

While in the broadest possible sense there may be power for this Court to exercise pendent jurisdiction, it must be remembered that acceptance of pendent jurisdiction is a doctrine of discretion, and not of plaintiffs' right. *Id.*, 383 U.S. at 726, 86 S.Ct. at 1139. The Court has balanced judicial economy and fairness to the parties against the State of Texas' rights to have their own state courts decide matters of Texas state policy and specific application and interpretation of Texas statutes. It appears that the better course for this Court to take is to decline pendent jurisdiction and allow the parties to litigate the pendent claim in state court to obtain a more certain application of the state law and policies involved.[23]

IV. *Conclusion*

In accordance with the findings and conclusions enumerated herein, it is

ORDERED, ADJUDGED and DECREED that

(1) Plaintiffs' claims alleging violations of Fourteenth and Fifteenth Amendments to the Constitution of the United States and violations of 42 U.S.C. § 1983 are each and every one found to be without merit;

(2) Plaintiffs' claim based upon state law, specifically, violation of Tex.Rev.Civ. Stat.Ann. art. 970a § 8 A (1963) is DISMISSED; and

(3) The temporary injunction issued December 5, 1977 and subsequently modified on December 22, 1977, restraining the Village of Dickinson, its Mayor and Aldermen, is hereby DISSOLVED.

policy involved in incorporating some, but not all of a community as a town or village.

**23.** The Court is particularly reluctant to retain pendent jurisdiction of the state claim in this case since the evidence adduced at trial indicated that the state claim constituted the real body of the case, with the federal claim being grossly lacking in substantive proof, a seeming mere appendage to the action. See, *United*

*Mine Workers of America v. Gibbs*, 383 U.S. at 727, 86 S.Ct. at 1139. The Court has also considered that pendency of this claim in federal court and its dismissal herein will not present a prejudicial limitation bar precluding plaintiffs' refiling the state claim in a proper state court with jurisdiction. *See*, Tex.Rev.Civ. Stat.Ann. art. 5539a.