**Randolph MAHONE, Plaintiff-Appellant,**

v.

**ADDICKS UTILITY DISTRICT OF
HARRIS COUNTY, et al.,
Defendants-Appellees.**

No. 86–2629.

United States Court of Appeals,
Fifth Circuit.

Feb. 4, 1988.

David Showalter, Pamela Prince Stines, Bellaire, Tex., for plaintiff-appellant.

Glen E. Clover, Liddell, Sapp, Zivley & Laboon, Patricia L. Jones, Houston, Tex., for Addicks, Fitch, O'Rourke, Burpo, Taylor, Horning, Jones, Alan Jones, Bennion, Blocker, Cate.

B.D. Daniel, Susman & Kessler, Morton L. Susman, Charles S. Baker, Houston, Tex., for O'Donnell & Surburban Homes Realty.

Robert L. Lipstet, Dunn, Lipstet, Singer & Hirsch, Constance G. Decker, Houston, Tex., for Atkinson & Atkins.

Fred Knapp, Jr., Andrews & Kurth, Houston, Tex., for Moreland, Etc.

Before WISDOM, GEE and KING *, Circuit Judges.

* Formerly Carolyn Dineen Randall.

CAROLYN DINEEN KING, Circuit Judge:

Plaintiff sued the Addicks Utility District, its officers and directors, and various businesses and individuals over the Utility District's decision not to annex a parcel of land plaintiff owned. Plaintiff's complaint alleged antitrust and civil rights claims. After being served, all but two of the defendants filed with the district court motions to dismiss the complaint with prejudice. Each motion argued that, as written, the complaint failed to state any claim upon which relief could be granted. After conducting a hearing, the district court granted all of the defendants' motions and, on its own motion, also dismissed with prejudice all claims against the two defendants who had not raised motions of their own. It is from this action that the plaintiff appeals, arguing simply that the rigorous standards for dismissal were not met in this case and that, in any event, dismissal with prejudice was improper. Our review of the complaint convinces us that the district court correctly dismissed with prejudice plaintiff's antitrust claim and all of plaintiff's civil rights claims except the one based on the equal protection clause. With respect to the equal protection claim, however, we are unable to conclude on this record that the claim is inadequate. Therefore, we remand the equal protection claim for further consideration by the parties and the district court. In addition, because we have concerns about the possible effect that the doctrine of claim preclusion could have on plaintiff's ability to bring a subsequent suit under state law on related matters, we direct the district court to dismiss with prejudice only the federal claims that we now rule on or that it disposes of on remand.

I.

FACTS AND PROCEEDINGS BELOW

The Addicks Utility District ("the District") is a municipal corporation in western Harris County, Texas organized pursuant to article XVI, section 59 of the Texas

Constitution and chapter 54 of the Texas Water Code.[1] In general, a municipal utility district in Texas has the power, subject to certain rules and regulations, to review property owners' petitions for annexation into the utility district and to decide which properties are annexed. In 1977, the District exercised its annexation power to add to the District a 147 acre tract of land owned or controlled by Paul Wahlberg ("Wahlberg") and Edwin Franks ("Franks"). The effect of adding this tract to the District, however, was to encircle completely with annexed property a tract of approximately twenty acres of unannexed, undeveloped property. Because of the District's prior pattern of annexation, this unannexed tract became situated near the geographic center of the 600 acre District.

In January, 1982, Randolph Mahone ("Mahone") owned the twenty acre tract. In an effort to ready the tract for development, and thereby increase its value to potential purchasers, Mahone determined to obtain municipal utility services—including fresh water and waste water—from the District for the tract. Annexation, however, was a necessary prerequisite for obtaining the services. On several occasions, therefore, Mahone applied to the District for annexation. However, the Board of Directors of the District rejected each application Mahone filed. According to Mahone, the Board informed him that before it would even consider annexing his tract, Mahone would have to prepare and present

to the Board expensive development plans. In addition, several individuals associated with the District "demanded more than two times" that, as a condition precedent to annexation, Mahone agree to pay money to certain developers whose land was already included in the District. Mahone, however, considered these demands for payment to be illegal. He also balked at the request for development plans—as far as Mahone could ascertain, no other petitioner for annexation and utilities had been required to submit similar costly plans at such an early stage in the annexation process. Finally, Mahone learned that the District had extended municipal services to a seventy-six acre tract of land which was located farther from the District's physical plant than Mahone's tract and whose owner had applied for services after Mahone.

Believing that his experience with the District evidenced an illegal conspiracy between the District, its employees, and the developers whose property who had already been annexed, on April 9, 1985, Mahone filed suit in the United States District Court for the Southern District of Texas. Named as defendants in Mahone's suit were: (1) the District and its former and present directors ("the District defendants"); (2) an engineering firm and its owner employed by the District ("the Atkinson defendants"); (3) the developers to whom Mahone had been asked to pay money ("the O'Donnell defendants"); (4) another business and its owner ("the Moreland defendants"); (5) Wahlberg; and (6) Franks.[2] In

---

1. Since the district court granted the defendants' motions to dismiss, this case reaches us on the pleadings. Therefore, our recitation of the facts is controlled by the principle that on an appeal from a dismissal for failure to state a claim, we must construe the plaintiff's complaint in the light most favorable to him and treat as true all well-pleaded allegations contained in his complaint. *Clark v. Amoco Prod. Co.,* 794 F.2d 967, 970 (5th Cir.1986); *O'Quinn v. Manuel,* 773 F.2d 605, 608 (5th Cir.1985). Accordingly, the facts we set out above are those alleged in Mahone's complaint, supplemented when necessary with that relevant information which is a matter of public record. *See Papasan v. Allain,* 478 U.S. 265, n. 1, 106 S.Ct. 2932, 2935 n. 1, 92 L.Ed.2d 209 (1986).

2. The defendants, as named in Mahone's complaint, were:

(1) The District defendants: the District; Charles Fitch, president of the District's Board of Directors; Dennis P. O'Rourke, secretary/treasurer of the District; Nicholas Burpo, director of the District; Thomas F. Taylor, Jr., former director of the District; Gary Horning, former director of the District; Steven E. Jones, vice-president of the District's Board of Directors; Alan Jones, assistant secretary of the District's Board of Directors; Roy I. Bennion, director of the District; Noel G. Blocker, director of the District; and Randal Cate, former director of the District.
(2) The Atkinson defendants: Robert Atkinson, Jr., d/b/a R.M. Atkinson, Jr. Engineers, Inc.; and R.M. Atkinson, Jr. Engineers, Inc.
(3) The O'Donnell defendants: Gerald E. O'Donnell, d/b/a Suburban Homes Realty;

his twenty-three page original complaint, Mahone asserted three claims against the defendants. First, Mahone charged that the defendants acted in conspiracy, under color of state law, and in violation of section 1983 of Title 42 to deny him his federal and constitutional rights. Specifically, Mahone accused the defendants of violating his constitutional right to vote in the District's elections, his right to procedural due process, and his right to the equal protection of the law. Second, Mahone charged that the individually named defendants were operating the District as an enterprise and engaging in a pattern of racketeering activities in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). As predicate crimes, Mahone charged the defendants with extortion, mail fraud, and wire fraud. Third, Mahone charged the defendants with conspiracy to monopolize, attempt to monopolize, and monopolization of the commercial and residential development of land in the District's physical area, all in violation of the antitrust laws.

In May, 1985, after being served, the District defendants and the O'Donnell defendants separately filed motions to dismiss Mahone's complaint. Although the specific grounds for the two motions varied somewhat, both protested that the complaint failed to state a claim upon which relief could be granted. The District defendants also moved for a more definite statement, and the Atkinson defendants filed a similar motion. Six months later, Mahone filed his response to the various defendants' motions; the District defendants and the O'Donnell defendants quickly countered with a reply to Mahone's response. On December 13, 1985, the district court conducted a hearing on all pending motions. At the hearing, the court deferred ruling on the motions to dismiss and granted the motions for a more definite statement. Accordingly, the court entered

an order directing Mahone "to amend his complaint within 20 days" and "to reduce [his] complaint to valid causes of action." On December 30, 1985, Mahone filed his First Amended Original Complaint.

Most of Mahone's amended complaint exactly duplicated his first effort. However, those changes which Mahone did make were significant. With respect to his civil rights claim, Mahone attempted to explicate his understanding of the relationship between the non-District defendants and the District. According to Mahone, the O'Donnell defendants, the Atkinson defendants, the Moreland defendants, Franks, and Wahlberg all had "close relationships" with the District defendants—relationships which they exploited to frustrate Mahone's attempts to obtain utilities for his tract of land. Moreover, Mahone alleged, the non-District defendants were all "inextricably intertwined in the affairs of the [District Board of Directors] and exercis[ed] *de facto* control" over its acts and decisions. In addition, Mahone concluded that the defendants' combined actions not only deprived him of the earlier alleged constitutional and federal rights, they also deprived him of "substantive" rights protected by the Constitution and caused him to suffer mental anguish and emotional distress. While Mahone's newly pled civil rights claim, therefore, was more expansive than the version contained in his original complaint, Mahone's newly pled antitrust claim presented a somewhat more limited version of his earlier claim. Most significantly, Mahone eliminated the District defendants as parties against whom the claim was asserted. The most notable change in the amended complaint, however, had to do with the RICO claim—all references to it were completely expunged.

The filing of the amended complaint triggered a flurry of activity among the defendants. In January, 1986, the Moreland defendants filed their first motion to dis-

and William S. O'Donnell, Jr., d/b/a Suburban Homes Realty.
(4) The Moreland defendants: J. Marvin Moreland, Jr. and d/b/a Greer, Moreland, Fosdick, Shepherd Inc.
(5) Paul Wahlberg and Edwin Franks, Jr.

Each individually named defendant was sued in both his official and individual capacity. On occasion throughout this opinion, we will use the phrase "the defendants" to refer to the defendants collectively.

miss and the O'Donnell defendants amended their earlier motion. Then in February, the Atkinson defendants added to the fray with their own request for dismissal. Counting the still-pending earlier motion from the District defendants, by early February the district court was faced, therefore, with four separate motions to dismiss. Although each motion challenged the manner in which Mahone alleged his claims, their specific allegations varied significantly. As a result, the arguments put forth in the four motions sometimes overlapped and sometimes did not. Similarly, sometimes the arguments applied to the defendants as a whole and sometimes they related only to the particular sets of defendants which raised them. While the defendants' reasons supporting dismissal were before the court by February, Mahone and the defendants traded responses and replies for another month before a hearing was held. Finally, on March 24, the district court held a motion conference to consider all of the defendants' claims. At the end of the conference, the court granted all pending motions to dismiss and, on its own motion, also dismissed all claims against defendants Wahlberg and Franks, the only defendants who had not filed motions. On April 17, 1986, the court entered its order memorializing its decision. After listing the motions which the court considered in making its decision, the order stated simply that "the Court is of the opinion and hereby finds that all of said Motions should be Granted" as to all defendants. No statement of reasons accompanied the order. This appeal by Mahone followed.

Although both the facts and procedure underlying this suit are complicated, Mahone presents to us on this appeal an argument noteworthy for both its brevity and simplicity: The standard for dismissing a complaint is very high. The defendants failed to meet the standard. And so the district court erred in granting defendants' motions. In the alternative, Mahone asserts that the court's dismissal should have been without prejudice so that Mahone could pursue his claims in state court. The defendants' responses, by necessity, are more complicated. They focus on each of the individual claims Mahone asserted, and argue against their viability using, in an abbreviated form, several of the same arguments which they initially raised below in support of their respective motions to dismiss. We will set forth the details of each argument as we examine them.

## II.

## THE STANDARD OF REVIEW

We begin by recognizing that motions to dismiss for failure to state a claim are disfavored in the law and, therefore, that a court will only rarely encounter circumstances which justify granting such a motion. *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir.1986); *Rios v. Dillman*, 499 F.2d 329, 330 (5th Cir.1974). We look askance at these motions, of course, because of the nature of the Federal Rules of Civil Procedure's pleading requirements. The Rules require only "notice" pleading—that is, " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) (quoting Fed.R.Civ.P. 8(a)(2)); *accord Boudeloche v. Grow Chem. Coatings Corp.*, 728 F.2d 759, 762 (5th Cir.1984). In addition, we must liberally construe the pleadings "to do substantial justice." Fed.R.Civ.P. 8(f); *Dickens v. Lewis*, 750 F.2d 1251, 1254 (5th Cir. 1984); *United States v. Uvalde Consol. Indep. School Dist.*, 625 F.2d 547, 549 (5th Cir.1980), *cert. denied*, 451 U.S. 1002, 101 S.Ct. 2341, 68 L.Ed.2d 858 (1981). In *Conley*, the Supreme Court described the standard which determines, in the context of a motion to dismiss, whether a particular pleading gives the requisite "notice" of a cognizable claim:

In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley,* 355 U.S. at 45–46, 78 S.Ct. at 102. Under this standard, a court is not permitted to dismiss a complaint simply because it is questionable that the plaintiff will prevail on his claims. *Clark,* 794 F.2d at 970; *see Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1973). "Even if it seems 'almost a certainty to the court that the facts alleged cannot be proved to support the legal claim,' the claim may not be dismissed so long as the complaint states a claim." *Clark,* 794 F.2d at 970 (quoting *Boudeloche,* 728 F.2d at 762). Of course, the mere fact that a standard is stringent does not suggest that it can never be met. In fact, we have recognized that there are times when a court *should* exercise its power to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Rios,* 499 F.2d at 330. Dismissal is certainly appropriate, for example, if the complaint itself shows a bar to relief—when this happens, it is "beyond doubt" that no set of facts will allow plaintiff to prevail. *Clark,* 794 F.2d at 970. It is with this understanding of how a plaintiff's complaint must be reviewed that we examine Mahone's claims.

### III.

### MAHONE'S CLAIMS

#### A. The Civil Rights Claims

■ Mahone's complaint first focuses on section 1983 of Title 42, the Civil Rights Act of 1871. To state a claim upon which relief can be granted under section 1983, however, the complaint must show the deprivation of a right, privilege, or immunity that is secured by either the Constitution or laws of the United States. *Brantley v. Surles,* 718 F.2d 1354, 1357–58 (5th Cir.

1983); *Bradt v. Smith,* 634 F.2d 796, 799 (5th Cir. Unit A Jan. 1981), *cert. denied,* 454 U.S. 830, 102 S.Ct. 125, 70 L.Ed.2d 106 (1981). In his complaint, Mahone set out three separate deprivations of his constitutional rights which he allegedly suffered because of the defendants' actions: a deprivation of property without due process of law, a denial of the equal protection of the laws, and a denial of the right to vote in the District's elections.[3] We review the sufficiency of his right to vote claim first.

#### 1. The Voting Rights Claim

■ Mahone's complaint alleges that "[i]n drawing the boundary of Addicks Utility District so as to exclude [Mahone's] land, the Defendants have denied [Mahone] the right to vote in elections in Addicks."[4] A similar argument was made and rejected in *Jimenez v. Hidalgo County Water Improvement Dist. No. 2,* 68 F.R.D. 668 (S.D. Tex.1975), *aff'd mem.,* 424 U.S. 950, 96 S.Ct. 1423, 47 L.Ed.2d 357 (1976). In that case, a specially convened three-judge court reviewed a claim by a class of plaintiffs composed, in part, of landowners whose properties were excluded from the Hidalgo County Water Improvement District. The landowners claimed that their exclusion unconstitutionally destroyed their ability to vote in water district elections. In rejecting the landowners' voting rights claim, Judge Gee, writing for the panel, discussed the power of municipal corporations to alter their own boundaries. He noted that as long ago as 1907, the Supreme Court recognized that "[t]he alteration of the boundaries of political subdivisions by the state is a political function entirely within the pow-

3. We note that in his complaint, Mahone alleges that his right to vote in the District's election is "a right protected by federal law." We assume that the "federal law" which forms the basis of Mahone's voting rights claim is the Constitution, not any statute enacted by Congress. We make this assumption for three reasons: (1) Mahone points to no statute in support of his claim; (2) we have uncovered no statute suggesting that federal law guarantees the right to vote in elections conducted by a state utility district; and (3) the remainder of Mahone's section 1983

claims—with which this claim is pled—are clearly constitutionally, not statutorily, based.

4. Since Mahone's land is outside the boundaries of the District, Mahone of course has no constitutional right to take part in the District's elections. As the Supreme Court has acknowledged, "our cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." *Holt Civic Club v. Tuscaloosa,* 439 U.S. 60, 68–69, 99 S.Ct. 383, 389, 58 L.Ed.2d 292 (1978).

er of the state legislature to regulate." *Id.* at 671 interpreting *Hunter v. City of Pittsburgh*, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907)). Judge Gee also noted that we have stated, in regard to annexations, that "[t]he annexation of lands to a city has been held without exception to be purely a political matter entirely within the power of the State Legislature to regulate." *Id.* at 672 (quoting *Hammonds v. City of Corpus Christi*, 343 F.2d 162, 163 (5th Cir.), *cert. denied*, 283 U.S. 837, 86 S.Ct. 85, 15 L.Ed.2d 80 (1965)). Based on these precedents, Judge Gee concluded that "the power of political subdivisions of states, such as municipalities and water districts, to alter boundaries, is almost absolute as far as the federal Constitution is concerned." *Id.* at 672.

■ The conclusion that a political subdivision's power is "almost absolute" instead of unequivocally absolute came from Judge Gee's recognition that the Supreme Court has, in the context of racial gerrymandering, found that a municipality's power to alter boundaries gives way to the equal

protection clause of the Constitution. *Id.* at 672–75. Since *Jimenez* was decided, the Supreme Court has also held that political gerrymandering cases are properly justiciable under the equal protection clause. *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 2816, 92 L.Ed.2d 85 (1986).[5] Neither of these exceptions is of avail to Mahone, however. In his complaint, Mahone does not suggest that the District was motivated by either racial or political concerns when it decided not to annex Mahone's tract of land. In fact, Mahone does not couch his voting rights claim in terms of gerrymandering or equal protection analysis at all. Instead, he argues simply that because he was excluded from the district, he has no right to vote. As *Jiminez* explained, however, unless one of the recognized exceptions applies, the Constitution does not forbid a water district or other municipality from excluding land even if the effect of the exclusion is to divest the excluded landowner of his right to vote in district elections.[6] Mahone,

5. In *Jiminez*, the panel was faced with a claim of political gerrymandering. Because the panel concluded that the Supreme Court had never recognized the justiciability of political gerrymandering, the panel refused to extend those Supreme Court cases which found claims of racial gerrymandering to be justiciable into this new context. The Supreme Court subsequently affirmed *Jiminez* without opinion. Ten years later in *Davis*, however, the Court directly addressed the issue of political gerrymandering and observed that:

> In the years since *Baker v. Carr*, ... we have also affirmed a number of decisions in which the lower courts rejected the justiciability of purely political gerrymandering claims.... Although these summary affirmances arguably support an inference that these claims are not justiciable, there are other cases in which federal or state courts adjudicated political gerrymandering claims and we summarily affirmed or dismissed for want of a substantial federal question.
> These sets of cases may look in different directions, but to the extent that our summary affirmances indicate the nonjusticiability of political gerrymander cases, we are not bound by those decisions. As we have observed before, "[i]t is not at all unusual for the Court to find it appropriate to give full consideration to a question that has been the subject of previous summary action.

*Davis*, 106 S.Ct. at 2804 (citations omitted). *Jiminez* was one of the cases which the Court

read as holding that political gerrymandering claims are nonjusticiable. It appears, therefore, that *Jiminez's* ruling on the political gerrymandering issue was implicitly overruled by *Davis*. That does not mean, however, that *Jiminez's* discussion of the power which a municipality *generally* has to change its boundaries in a way which affects the ability of people to vote in municipal elections is wrong. Instead, it simply means that the *Jiminez* court did not anticipate the Supreme Court's recognition of an additional exception to the general rule. In this case, no question of an exception to the general rule is raised. Therefore, we find the reasoning in *Jiminez* to be controlling.

6. In reality, Mahone's claim is even weaker than the one which faced the court in *Jiminez*. There, landowners had been excluded from the water district to which they had belonged and, because of their changed status, actually lost their previously held right to vote. Although Mahone's complaint claims that his tract of land was similarly "excluded" from the District, it is clear from the remainder of the facts in the complaint that he is using the word "exclusion" differently from the way in which the *Jiminez* panel used it. To the *Jiminez* panel, the term meant "to be put out" or "displaced." Mahone, on the other hand, uses it to mean "kept out" or "not included." The difference in use becomes important when we focus on the deprivation which is alleged to have occurred because of the "exclusion." In *Jiminez*, the plaintiffs lost a

therefore, has not stated a cognizable voting rights claim. We turn next to his due process claim.

## 2. The Due Process Claim

■ In his complaint, Mahone alleges, in essence, that the District's hearing on his petition for annexation was procedurally inadequate because the District's board was biased against him, and because he was not afforded the opportunity to put on and cross-examine witnesses.[7] Mahone's allegation, therefore, is that the defendants' actions denied him his rights to procedural due process.[8] To be entitled to due process, however, Mahone needed to present facts showing that he was deprived of a property interest. *See Board of Regents v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 54 (1972). Both in the district court below and now before us, the defendants argue that Mahone failed to meet this burden. In response, Mahone points to the Texas Water Code, arguing that it establishes a policy requiring individual utility districts to provide utilities to lands "area-wide"—a policy which Mahone alleged in his complaint that the District violated by denying Mahone's

request for annexation. To determine whether Mahone successfully pled a procedural due process claim, therefore, we must first determine what a "property interest" is and whether Mahone has alleged one.

■ In *Roth*, the Supreme Court explained that the definition of "property interest," when it arises in the context of the fourteenth amendment, is not limited by traditional concepts of ownership. Indeed, "the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." *Id.* at 571–72, 92 S.Ct. at 2706. Consequently, besides protecting individual interests in real and personal property, the fourteenth amendment's due process safeguards also extend to the "interests that a person has already acquired in specific benefits." *Id.* at 576, 92 S.Ct. at 2708. The questions, therefore, are when and how a person acquires an "interest in specific benefits" which will trigger the due process clause. The Supreme Court explained "when" in *Roth*:

> To have a property interest in a benefit, a person clearly must have more than an

previously held right to vote in municipal district elections. Mahone's exclusion, however, did not divest him of the right to vote—because his land has never been included within the District, he never enjoyed the right to begin with. Properly understood, therefore, Mahone's argument is that because he wants to vote in district elections, the District should annex his property so that he can vote. The Supreme Court has never recognized that the power of a municipal utility district to decide its boundaries can be curtailed solely by the landowner's desire to be annexed. The effect of so holding would be to eviscerate the municipality's power, which we decline to do.

7. Mahone's allegations, in pertinent part, were that:

> The Defendants have acted in an arbitrary and wanton manner, and have denied the Plaintiff a meaningful opportunity to be heard on the exclusion of his land from the district, and on his request for annexation; have denied him the opportunity to be heard by an impartial and unbiased tribunal or board; have denied him the opportunity to put on evidence on his behalf; and have denied him the opportunity to cross examine those persons or entities opposed to his appli-

cation for municipal services or in favor of his exclusion.
*Mahone v. Addicks Utility Dist.,* No. H–85–1724 (S.D.Tex. Dec. 30, 1985) (amended complaint).

8. As we mentioned earlier, in the amended version of his complaint Mahone alleged that the defendants' actions deprived him of "substantive and procedural rights." It is unclear, since no new facts were adduced to support this allegation, whether in his amended complaint Mahone meant to add a substantive due process claim to his previous allegation of a procedural due process deprivation. We find it unnecessary, however, to resolve the issue. We have determined that Mahone's procedural due process allegations do not state a claim because Mahone has failed to assert a sufficient property interest on which to base his claim. *See* text *infra.* Any substantive due process claim Mahone intended to allege, therefore, must fail for the same reason. As we recently acknowledged, "[a] violation of 'substantive' due process … occurs only when the government deprives someone of liberty or property." *Brennan v. Stewart,* 834 F.2d 1248, 1257 (5th Cir.1988). Since no liberty interest is alleged here, and since Mahone's allegations of a property interest are inadequate, both Mahone's procedural due process and substantive due process claims must fail.

abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

*Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. In a nutshell, therefore, when a person has a legitimate claim of entitlement to a benefit, he has a protected property interest sufficient to entitle him to due process. How these "legitimate claims of entitlement" arise is equally clear. As the Supreme Court explained, "[p]roperty interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.* As Mahone appears to recognize, therefore, he has no *constitutional* right to have his petition for annexation approved by the District. *Accord Wilkerson v. City of Coralville, Iowa,* 478 F.2d 709, 711 (8th Cir.1973); *cf. Lyng v. Payne,* 476 U.S. 926, 106 S.Ct. 2333, 2343, 90 L.Ed.2d 921 (1986) ("We have never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause of the Fifth or Fourteenth Amendments."). Consequently, Mahone's complaint must point us to another source—such as a contract, statute, or mutually recognized entitlement—to support his right of annexation. *See Bishop v. Wood,* 426 U.S. 341, 344 & n. 6, 96 S.Ct. 2074, 2077 & n. 6, 48 L.Ed.2d 684 (1976). Even if the complaint succeeds in naming a source, however, Mahone's task is not complete—for we must remember that not all interests recognized by the state are protected by the Constitution. "Although the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of

entitlement' protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978); *see Thompson v. Bass,* 616 F.2d 1259, 1265 (5th Cir.), *cert. denied,* 449 U.S. 983, 101 S.Ct. 399, 66 L.Ed.2d 245 (1980).

■ According to Mahone's complaint, his property interest arises as a result of section 54.233 of the Texas Water Code, which provides:

The powers and duties conferred on [a municipal utility] district are granted subject to the policy of the state to encourage the development and use of integrated area-wide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state, it being an objective of the policy to avoid the economic burden to the people and the impact on the quality of the water in the state which result from the construction and operation of numerous small waste collection, treatment, and disposal facilities to serve an area when an integrated area-wide waste collection, treatment, and disposal system for the area can be reasonably provided.

Tex. Water Code Ann. § 54.233 (Vernon 1972). This policy of area-wide waste treatment, according to Mahone, shows that he is entitled to utilities and, so the argument goes, to annexation. We must disagree. Mahone's reasoning suggests that everyone who can be annexed into a particular municipal utility district must be annexed as soon as a request for annexation is made. This reasoning, however, is not supported by the provisions of the Water Code—including the very provision on which Mahone relies—which control the manner in which utility districts may operate. Section 54.714 of the Water Code, for example, describes the limitations under which a utility district operates when deciding whether to grant a landowner's petition for annexation:

The board shall hear and consider the petition and may add to the district the land described in the petition if it is considered to be to the advantage of the

district and if the water, sewer, and drainage system and other improvements of the district are sufficient or will be sufficient to supply the added land without injuring land already in the district. *Id.* § 54.714(a). This section indicates that at the very least, a landowner's tract cannot be annexed unless two criteria are met: (1) the utilities are or will be sufficient to service the newly annexed land; and (2) servicing the newly annexed land will not injure already annexed land. Section 54.-233 of the Water Code accommodates these requirements by limiting the policy of area-wide treatment to those situations "when an integrated area-wide [utility] system for the area *can be reasonably provided.*" *Id.* § 54.233 (emphasis added). Mahone's complaint, of course, does not allege that these requirements—which are the minimum necessary to even suggest an entitlement to annexation—were met in his case. Moreover, we are not convinced that Mahone would have successfully pled a property interest even if he had made these allegations. We have found nothing to suggest that this policy is anything more than that —a guiding principle which each district is to consider when making annexation decisions. To read section 54.233 instead as a mandate for area-wide annexation would, we think, be reading too much. For one

thing, it would have the effect of contradicting the express words of discretion which the Texas legislature chose to use in section 54.714 to describe the utility district's power to annex land—"the board shall hear and consider the petition ... and *may add* to the district the land described....[9]

■ We find, therefore, that the Texas Water Code does not give Mahone the right to have his tract of land added to the District. Mahone's complaint did not allege that the District has, by custom or implementation of regulations, narrowed the discretion apparently granted it by the state statutes. Mahone's desire to have his land annexed, therefore, amounted to a mere "unilateral expectation" rather than a "legitimate claim of entitlement." Consequently, because Mahone failed to allege a property interest, his procedural due process claim was properly dismissed under Rule 12(b)(6).[10] The failure to allege a property interest does not, however, dispose of Mahone's equal protection claim. It is not necessary to prove a deprivation of property to establish a violation of the equal protection clause. *Brennan,* 834 F.2d at 1257. Consequently, we must evaluate the final component of Mahone's civil rights claim—that he has received "uneven treatment" by the District in the applica-

**9.** This case is, therefore, distinguishable from those cases which hold that applicants for welfare benefits are entitled to due process protection. *See Daniels v. Woodbury County, Iowa,* 742 F.2d 1128, 1132–33 (8th Cir.1984); *Griffeth v. Detrich,* 603 F.2d 118, 120–22 (9th Cir.1979), *cert. denied,* 445 U.S. 970, 100 S.Ct. 1348, 64 L.Ed.2d 247 (1980); *Johnston v. Shaw,* 556 F.Supp. 406, 412–13 (N.D.Tex.1982). *See also Gregory v. Town of Pittsfield,* 470 U.S. 1018, 105 S.Ct. 1380, 84 L.Ed.2d 399 (1985) (O'Connor, J., joined by Brennan and Marshall, JJ., dissenting from denial of certiorari); *Peer v. Griffeth,* 445 U.S. 970 (1980) (Rehnquist, J., dissenting from denial of certiorari). In *Griffeth,* the Ninth Circuit found that applicants for county welfare benefits possessed a constitutionally protected property interest because of the mandatory language of the authorizing state statute and the definite eligibility criteria of the applicable county regulations. 603 F.2d at 120–22. Relying on *Griffeth,* the Eight Circuit subsequently found that applicants for county relief assistance had a constitutionally cognizable property interest because the applicable state statute and

county regulations provided that an applicant "shall" be granted benefits if he satisfied the regulatory criteria. *Daniels,* 742 F.2d at 1132. No similar mandatory language is used in the Texas statutes to describe the annexation procedure.

**10.** Mahone's complaint also contains the following allegation: "[The defendants] unlawfully excluded [Mahone's] land from [the District] by failing to give the statutory notice of such exclusion to all interested landowners and by failing to provide a hearing on such exclusion." If Mahone's tract of land had actually been removed from the District, Mahone might have alleged a recognizable property interest. As we explained earlier, however, Mahone's tract of land was never included in the District to begin with. *See supra* note 7. Having never received any benefits, Mahone therefore cannot claim the same interest in specific benefits as other landowners who actually, at one time, received them. Consequently, we find it unnecessary to determine whether, as Mahone alleges, either notice or a hearing would have been statutorily required before the District could exclude land.

tion of its annexation procedures and, therefore, has been denied the equal protection of the laws.

### 3. The Equal Protection Claim

█ The equal protection clause essentially requires that all persons similarly situated be treated alike. *City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). Because the clause's protection reaches only dissimilar treatment among similar people, if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws. *Brennan*, 834 F.2d at 1257. To determine whether Mahone has pled a cognizable equal protection claim, therefore, we first look to see if his complaint challenges the manner in which he has been "classified" by the District.

In many, if not most, equal protection cases, the classification to which the plaintiff objects is explicitly set out in the legislation under which the state acts. By using standards, qualifications, or criteria to control the scope and applicability of the legislation, the legislation itself classifies. Mahone's complaint, however, is unlike the usual equal protection claim because it does not challenge a scheme of classification embedded in a statute. For example, Mahone does not quarrel with the Water Code's official criteria for annexation. *See* Tex. Water Code Ann. § 54.714 (Vernon 1974). Instead, Mahone alleges that the District, in carrying out its statutorily prescribed annexation duties, applied a non-statutory requirement to him differently than it applied the requirement to other similarly situated landowners. Specifically, Mahone alleges that other applicants were not required to file development plans until well into the annexation process; he, in contrast, was told that his plans had to be on file before the process of reviewing his application could begin. In this case, therefore, it is the application of the rule—rather than the rule itself—which creates the classification.

█ This focus on application, although different from the many challenges which are made to specific rules, does not make Mahone's claim any less actionable. As the Supreme Court explained long ago, equal protection of the law requires not only that laws be equal on their face, but also that they be executed so as not to deny equality. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *accord Zeigler v. Jackson*, 638 F.2d 776, 779 (5th Cir. Unit B March 1981) ("[T]he unequal application of a state law, fair on its face, may act as a denial of equal protection."). Nor does the fact that Mahone is challenging actions of a state agency other than the legislature hurt his claim. "[S]tate action, of a kind that falls within the prescription of the Equal Protection Clause of the Fourteenth Amendment, may be brought about through the state's administrative and regulatory agencies just as through the legislature." *Robinson v. State of Florida*, 378 U.S. 153, 156, 84 S.Ct. 1693, 1695, 12 L.Ed. 2d 771 (1964). Therefore, we find that the classification Mahone is challenging is clear. As applied, the "development plan" rule classifies into two groups landowners who desire to be annexed into the District. The first group includes those like Mahone who must file development plans before annexation proceedings can begin. The second group consists of those who are given until later in the annexation process to file their plans.

█ We think, however, that Mahone's complaint also alleges a classification of another sort. Mahone claims the defendants told him that, as a condition precedent to annexation, he would have to make "unlawful" payments to private developers whose land is already included in the District. Mahone does not allege that he was the only landowner upon whom this requirement was imposed. We must assume, therefore, that everyone who wanted his land annexed was asked to make similar payments. Since we cannot say that this "payment" rule is being applied discriminatorily among applicants, we also

cannot say that it causes the type of classification system the "development plans" rule does. It would be a mistake, however, to conclude that because a rule is applied uniformly, no equal protection problem can arise. A discriminatory rule that is uniformly applied may still have a discriminatory result.[11] For example, Mahone alleges that the unlawful payments are a condition precedent to annexation. According to Mahone, therefore, if a landowner pays, his land can be annexed; if he does not pay, his land will not be annexed. In Mahone's allegation, it is the annexation decision and not the "unlawful" payment rule which creates the classification. The District classifies landowners into two groups when it makes annexation decisions: those who pay money to developers in the District and those who do not.

■ Having decided that Mahone's complaint alleges two separate classifications does not complete our review. Our task is still to determine whether similarly situated persons are being treated alike. To aid our inquiry, the Supreme Court has developed a general rule for testing official action which is challenged on equal protection grounds: the challenged action is presumed to be valid and must be sustained if the classification drawn by the action is rationally related to a legitimate state interest.[12] *Cleburne,* 473 U.S. at 439–40, 105 S.Ct. at 3254–55. An equal protection challenge, therefore, focuses on three separate elements. First, the classification. Second, the purpose which the classification is designed to serve. And third, the "fit" between the classification and the purpose; that is, whether the state could rationally determine that by distinguishing among persons as it has, the state could accomplish its legitimate purpose. Since we have already defined the classifications at issue in Mahone's complaint, we are ready to address a second question: What legitimate interest, or purpose, could the Dis-

11. The Supreme Court recently explained:
    [T]he fact that all those not benefited by the challenged exemption are treated equally has no bearing on the legitimacy of that classification in the first place. A State cannot deflect an equal protection challenge by observing that in light of the statutory classification all those within the burdened class are similarly situated. The classification must reflect pre-existing differences; it cannot create new ones that are supported by only their own bootstraps. "The Equal Protection Clause requires more of a state law than nondiscriminatory application within the class it establishes."
    *Williams v. Vermont,* 472 U.S. 14, 27, 105 S.Ct. 2465, 2474, 86 L.Ed.2d 11 (1985) (quoting *Rinaldi v. Yeager,* 384 U.S. 305, 308, 86 S.Ct. 1497, 1499, 16 L.Ed.2d 577 (1966)). In this case, therefore, the District cannot answer Mahone's equal protection claim merely by arguing that it has treated all persons within the burdened class the same; that is, that it has refused to annex everyone who will not make the required payments. The real question which Mahone's second classification raises is whether landowners who refuse to pay money to other District developers are "similarly situated" to landowners who make the payments. The question can only be answered by performing the rationality analysis. *See* text *infra.* If a legitimate reason for classifying the landowners differently exists, and that legitimate reason is rationally related to the classification, the two sets of landowners are not similarly situated and no equal protection violation has occurred. If, however, the classification is not rationally related to a legitimate state interest, the landowners are similarly situated and by refusing to annex the land of owners who will not make the required payments, the District has violated the equal protection clause.

12. This general rule, of course, gives way when the state classifies on the basis of race, alienage, or national origin, or when the classification impinges on personal rights protected by the Constitution. *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3255. With classifications of this sort, the state action is subjected to strict scrutiny—it can be upheld only if the classification is "suitably tailored to serve a compelling state interest." *Id.* The Supreme Court has also subjected to a form of heightened review state actions which classify according to gender or illegitimacy. *Id.* at 440–41, 105 S.Ct. at 3255. When the classification focuses on gender, the state action is valid only if gender "is substantially related to a sufficiently important governmental interest." *Id.* at 441, 105 S.Ct. at 3255. When the state treats illegitimate persons differently from those born legitimate, the action can be upheld only if illegitimacy is "substantially related to a legitimate state interest." *Id.* These variations on the general rule, however, need not concern us here. The classifications which Mahone has alleged do not focus on any of the traits which trigger heightened scrutiny. Nor do they impinge on any personal rights protected by the Constitution. Therefore, we must test the District's action according to the general rule.

trict have had in mind when it made the classifications?

■ To answer this question, we must first determine the status of the District's actions. In *Shelton v. City of College Station,* we explained that a court reviewing a regulatory decision according to a rationality analysis could follow "either of two analytical tracks. A regulatory decision can be legislative or it can be adjudicative, and it will be reviewed differently depending on which category it is placed into." 780 F.2d 475, 479 (5th Cir.) (en banc), *cert. denied,* — U.S. ——, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986). We explained that under the adjudicative model, actions by state officials are tested by historical facts and "adequate evidence found within a defined record." *Id.* Consequently, in determining what interest prompted a particular action, a court using the adjudicative model must focus on what actually motivated the conduct. As we also explained, however, the same is not true if the action is evaluated under the legislative model. Under this model, a court's inquiry is very limited— the court may ask whether there was "a conceivable factual basis for the specific decision made" and nothing more. *Id.* at 480. In practical terms, therefore, evidence that an official was motivated by an illegitimate purpose when he took an action cannot, under the legislative model, invalidate the official's action. Instead, if a court is able to hypothesize a legitimate purpose to support the action, the action must be treated as valid.

In *Shelton,* we recognized that when a zoning board acts on an individual request for a variance, it appears in some sense to be making both a legislative and a judicial decision. Because its apparent focus is on the individual case before the board, the process of determining whether a variance should be granted has distinctly adjudica-tive characteristics. We found, however, that during the apparently adjudicative process, the zoning board was motivated by legislative concerns—its role was to "decid[e] the best course for the community" and not necessarily to "adjudicat[e] the rights of contending petitioners." *Id.* Because of the way in which the appearance of adjudication mixed with the legislative purpose, we called the board's actions both "quasi-legislative" and "quasi-judicial." In determining whether their actions should be reviewed under either the legislative or adjudicative model, however, we were not at all ambivalent. As we explained, "that a state may choose to make a legislative decision by a process that resembles adjudication is not our immediate concern.... The states are free to make zoning decisions in ... a 'quasi-judicial' manner. But neither the Supreme Court nor this court has ever suggested that such a choice by the state works a metamorphosis of the Constitution's demand for minimum rationality." *Id.* at 481–82. Consequently, we concluded that the legislative model— which permits a decision to be justified by hypothesized purposes—must be used to determine the constitutional validity of a zoning board's actions.[13]

In *Kaplan v. Clear Lake City Water Authority,* 794 F.2d 1059 (5th Cir.1986), we applied *Shelton*'s analysis to decisions made by state-created water authorities. Water authorities, we explained, are political subdivisions formed under Texas law to provide water and sanitary sewer services to the area within its boundaries. *Id.* at 1060–61. Although we admitted that water districts do not possess the same broad governmental powers held by zoning boards, we still found it appropriate to characterize the districts as possessing "limited legislative or quasi-legislative functions." *Id.* at 1064. We arrived at this conclusion by focusing on the districts'

---

13. We added, however, the following proviso:
   As one turns from a frontal attack on a zoning ordinance to a specific zoning decision, it is true that there is a greater likelihood of encountering protected property interests, which can trigger a procedural due process inquiry.... Although we hold that a zoning decision can be justified by hypothe-sized purposes in the absence of such triggering property rights, we acknowledge that when such rights are affected, a later procedural due process inquiry might require a zoning board to point to *a* rational basis that was employed in reaching its decision.
   *Shelton,* 780 F.2d at 482 (emphasis in original).

discretionary powers. The Texas legislature, we noted, has given water districts some power to determine who gets services and when. *Id.* Even though we conceded that "the statute places restrictions on the exercise of that power by indicating that sound engineering practices, economics, and orderly development are considerations which enter into the decisionmaking process," we concluded that the power of discretionary review alone was sufficient to invoke the legislative model. *Id.*

■■■ We find that the analysis in *Shelton* and *Kaplan* requires us to test the District's decisions here under the legislative model.[14] Our review of the enabling provisions which define the powers of utility districts in Texas convinces us that, like water authorities and zoning boards, they possess limited "quasi-legislative" powers. Just as the water authority discussed in *Kaplan* had some power to determine who got services and when, utility districts have discretion to decide which petitions for annexation should be granted, *see* Tex. Water Code Ann. § 54.714 (Vernon 1972) ("The board … may add to the district the land described in the petition…."). The fact that this discretion is tempered by statutory criteria and a policy of area-wide treatment does not, anymore than it did in *Kaplan,* change our conclusion. As the criteria themselves demonstrate, the utility district's primary concern is whether annexation would be the best course for the district as a whole, not whether it would benefit the particular landowner who desired to be annexed. In determining what legit-

imate purpose the District had in mind when it created the classifications which Mahone challenges, therefore, we cannot limit ourselves to the District's actual purposes. Instead, the *Shelton* analysis requires us to uphold the District's actions if we can determine any conceivable factual basis to support the classifications.

We find, however, a complicating factor in our case that was not present in either *Kaplan* or *Shelton.* Both *Shelton* and *Kaplan* were decided on motions for summary judgment; the case before us, in contrast, was dismissed on the pleadings for failure to state a claim. While it is, of course, appropriate to look beyond the pleadings to decide whether summary judgment should be granted, the converse is true when the question is whether the pleadings state a claim. It is black-letter law that "[a] motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is to be evaluated only on the pleadings." *O'Quinn v. Manuel,* 773 F.2d 605, 608 (5th Cir.1985); *accord Jackson v. Procunier,* 789 F.2d 307, 309 (5th Cir.1986); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1356 (1969 & Supp. 1987). Not surprisingly, Mahone's pleadings do not set forth a legitimate reason for the District's classifications. We must decide, therefore, whether we are prohibited from hypothesizing a legitimate reason under *Shelton* because of the posture in which this case reaches us.

In researching this issue, we have uncovered two Supreme Court cases which guide

14. When we concluded in *Shelton* that the legislative model was appropriate, we were applying the rational relationship test to a substantive due process claim. *Shelton* also, however, raised an equal protection issue. With respect to the equal protection issue, we explained that, "[w]e do not hereafter separately focus upon this claimed denial of equal protection." *Shelton,* 780 F.2d at 478. Instead, we concluded that the rational basis which we found to support the legislative decision under the due process clause also supported the state's classification under the equal protection clause. *See id.* We reached this conclusion because we recognized that the only difference between applying the rational relationship analysis to an equal protection claim and applying it to a substantive due process claim is the focus on what must be

justified. In the due process context, the focus is on the individual: Is this particular action taken by the state rationally related to a legitimate state interest? In the equal protection context, however, the focus is on the classification: Is the classification rationally related to a legitimate state interest? The "legitimate state interest" analysis, therefore, remains the same regardless of which clause is implicated. Consequently, *Shelton's* holding that the legislative model must be used to review "quasi-legislative" actions by a state agency applies to rationality review conducted under either the due process or equal protection clause. Similarly, although *Kaplan's* review of the Texas water authority occurred in the context of a substantive due process claim, *Kaplan's* analysis applies equally in the equal protection sector.

us. In *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978), the Court had to decide whether a classification drawn by several Alabama statutes bore a rational relationship to a legitimate state purpose. Similarly, in *Williams v. Vermont*, 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985), the Court was concerned with whether a Vermont use-tax statute had a legitimate purpose for distinguishing between nonresidents and residents. In each case, the district court had dismissed the plaintiff's complaint for failing to state a cause of action. With each case, therefore, the Supreme Court faced the same situation we find before us. Neither case, however, found the Court questioning its authority to go beyond the pleadings to hypothesize a purpose. In *Holt*, for example, the Court stated its inquiry as "whether 'any state of facts reasonably may be conceived to justify' Alabama's system of police jurisdictions." 439 U.S. at 74, 99 S.Ct. at 392. A "momentary reflection" led the Court to the conclusion that the Alabama legislature could have decided on its course of action for several legitimate reasons. *Id.* The Court's opinion contained no suggestion that the legitimate reasons upon which it rested its holding were raised by the parties, much less contained in the plaintiff's complaint. Similarly, in *Williams*, the "legitimate purposes" which the Court reviewed included "the usual justifications" for a use-tax, justifications suggested by the State, and one hypothetical justification which the Court itself apparently both fashioned and rejected. *See* 472 U.S. at 24–27, 105 S.Ct. at 2472–74. The only acknowledgement in either case of the procedural posture in which the claim reached the Court came at the end of *Williams*, when the Court noted "that this action was dismissed for failure to state a claim before an answer was filed.... It is conceivable that, were a full record developed, it would turn out that in practice the statute does not operate in a discriminatory fashion." *Williams*, 472 U.S. at 28, 105 S.Ct. at 2474.

■ We recognize that neither of these Supreme Court cases directly holds that, when faced with the task of hypothesizing

a legitimate purpose to support a state's system of classification, a court may go outside the pleadings even if the question is whether the complaint fails to state a claim. We believe, however, that by utilizing the practice, the Court has supported it. We also think that under certain circumstances, the practice is sound. As we explained above, the task of hypothesizing necessarily renders less important the actual reasons which the state may have had for making the challenged classification. Therefore, it is immaterial that the complaint alleges reasons for the action which are not legitimate. *See Kaplan*, 794 F.2d at 1065. Going outside the complaint to hypothesize a purpose will not conflict with the requirement that, when reviewing a complaint dismissed under Rule 12(b)(6), we accept as true all well-pleaded facts. Moreover, when truth is not the issue, we can understand how using discovery procedures to develop facts showing the state's true reason for its actions could be, for all practical purposes, both inefficient and unnecessary. Consequently, in some cases it makes sense to use a motion to dismiss as the vehicle through which to address the viability of the plaintiff's claim. This would be especially true in those cases where, borrowing a phrase from the Supreme Court, "it takes but momentary reflection" to arrive at a purpose that is both legitimate beyond dispute and rationally related to the state's classification. *See Holt*, 439 U.S. at 74, 99 S.Ct. at 392.

We also recognize, however, that there are several reasons why a court may choose not to perform a rationality review under the auspices of a motion to dismiss. While *Shelton* holds that the historical facts which explain a state official's actions are not relevant when the legislative model applies, *Shelton* does not stand for the proposition that every fact out of which the plaintiff's action grew is also useless. A rationality analysis, though it may be premised on a hypothetical purpose, cannot be conducted in a vacuum. The purpose itself must still be found "legitimate," a determination which may require a reference to the circumstances which surround the

state's action. *See Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 882, 105 S.Ct. 1676, 1683–84, 84 L.Ed.2d 751 (1985) (holding that "acceptance of [the State's] contention that promotion of domestic industry is always a legitimate state purpose under equal protection analysis would eviscerate the Equal Protection Clause.... [U]nder the circumstances of this case, promotion of domestic business by discriminating against nonresident competitors is not a legitimate state purpose."). Moreover, rationality analysis requires more than just a determination that a legitimate state purpose exists; it also requires that the classification chosen by the state actors be rationally related to that legitimate state purpose. Although the legitimate purpose can be hypothesized, the rational relationship must be real. *See Cleburne*, 473 U.S. at 447–50, 105 S.Ct. at 3258–60 (examining and rejecting proffered legitimate reasons for classification because the reasons were not in fact rationally related to the classification). Consequently, the determination of the fit between the classification and the legitimate purpose—the search for rationality—may also require a factual backdrop. As we said in *Shelton*, "[w]e do not suggest that a zoning decision can be justified by mouthing an irrational basis for an otherwise arbitrary decision. A denial of a building permit on the King Ranch because of inadequate parking might fall into this category." 780 F.2d at 483.

The appropriateness of looking beyond the pleadings to perform a rational relationship analysis depends, then, on a number of factors. It depends on the specific facts pleaded by the plaintiff. It depends on the state of knowledge of the court making the analysis. It depends on the complexity of the official action which is being challenged. We cannot—nor do we think it is necessary to—fashion a single rule for all circumstances. We think the wiser course is to recognize the necessity of evaluating these factors according to the circumstances of the individual case and of acting as the circumstances dictate. The true question, therefore, is whether these factors, when applied to the allegations in Mahone's complaint, suggest that a *Shel-*

*ton*-type rationality analysis can properly be performed at the pleadings stage to defeat Mahone's claim. As the record in this case reaches us, we cannot say that they do not; however, we also cannot say that they do.

■■■ Fairly read, Mahone's complaint alleges that, in two different ways, the District classified into two groups similarly situated landowners: (1) at the petitioning stage, the District classified landowners as those who had to file development plans before District consideration of an annexation petition could begin, and those landowners who could wait until after the process was already underway to file the same plans; and (2) at the annexation stage, the District classified landowners as those landowners who paid money to private developers in order to be annexed and those landowners who did not. The district court's opinion, of course, gives no reasons at all in support of its dismissal. Since the court's opinion does not even tell us whether the court relied on the *Shelton*-type rationality analysis in dismissing the equal protection claim, the opinion aids us even less in determining whether the analysis was appropriate in this case at this point. Moreover, none of the defendants has suggested either to us or to the court below a legitimate purpose for these classifications, much less a legitimate purpose that is rationally related to them. Instead, the defendants have uniformly argued only hypothetical reasons which justify the District's decision not to annex Mahone's land. While these reasons might have been dispositive of Mahone's due process claim (had he properly alleged one), they are not dispositive of Mahone's equal protection claim. Due process requires a state actor to justify the individual action taken; equal protection, however, requires a state actor to justify the classification made. Nor have we been able to determine, on our own, a rationally related, legitimate purpose which is served by either of the classifications. That is not to say that none exists; it is simply an admission that an appellate court in this situation cannot function without input. We think, there-

fore, that Mahone's equal protection claim must be remanded for further consideration by the parties and the court.

On remand, the district court should first determine—according to the factors discussed above—whether a motion to dismiss is the appropriate vehicle for applying a *Shelton*-type rationality analysis to Mahone's claim.[15] If it concludes that its knowledge—when supplemented by the parties—is not complete enough to perform the analysis, the court must permit development of the claim at least to the summary judgment stage. As was true in both *Shelton* and *Kaplan*, it may be that undisputed facts will demonstrate the legitimacy of the District's actions. Summary judgment would, of course, then be appropriate. Alternatively, the undisputed facts may demonstrate that the classifications which Mahone has alleged are not real; that is, that the District did not impose the requirements on which Mahone's claim focuses. In that case, Mahone will be without proof of an essential element of an equal protection claim. However, we make no suggestion as to the eventual viability of Mahone's claim. We conclude only that, as they reach us, we are unable to say that Mahone's allegations fail to state an equal protection claim. Therefore, we find it necessary to return that claim to the district court.

## B. The Antitrust Claim

Having addressed the three civil rights claims on which Mahone's complaint focuses, we turn our attention to Mahone's antitrust claim. In his complaint, Mahone alleges that:

> Beginning on or about the year 1973, the exact date being unknown to Plaintiff, Defendants have engaged in an unlawful combination, and conspiracy to monopolize the commercial and residential development of land in the Addicks Municipal District's physical area, including the Plaintiff's 20.04 acres of land which are completely surrounded by the lands of Addicks. They have attempted to monopolize and have monopolized such trade in violation of the antitrust laws of the United States.

Following this broad allegation, the complaint lists "[t]he substantial terms" of the antitrust violations. These terms include: that the non-District defendants conspired with the Board of Directors of the District to provide municipal utilities only to the lands of developers "friendly to Defendants;" that the non-District defendants caused the Board of Directors to refuse to furnish Mahone's tract of land with utilities; that because of the non-District defendants' actions, Mahone was prevented from selling his land at a price higher than he could get for land without access to utilities; and that Mahone, therefore, lost the enhanced value of his tract of land by selling it at the raw acreage price. As a result of the non-District defendants' illegal behavior, Mahone finally alleges, Mahone lost "the reasonably foreseeable profits he would have made" if his land had been afforded access to the District's utilities.

Both below and on appeal, the non-District defendants argue that these allegations fail to state an antitrust claim. Their argument is that to properly allege an antitrust cause of action, a plaintiff must allege an injury to the market as well as an individual injury to the plaintiff. This, they conclude, Mahone failed to do. We agree with the non-District defendants to the extent that they are arguing that the injury alleged by a plaintiff in a private antitrust cause of action must be both personal and the type of injury the antitrust

15. We note, in passing, a line of cases which may affect the need for subjecting to rationality review the second classification which Mahone has alleged. *See Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Schaper v. City of Huntsville,* 813 F.2d 709 (5th Cir.1987); *Holloway v. Walker,* 784 F.2d 1287 (5th Cir.1986). Since none of the parties has addressed the question of whether the actions which caused the second classification implicate this line of cases, we make no comment on their applicability—except to say that the theory they espouse has never been applied in the context of an equal protection claim. Of course, on remand the court is free to consider all arguments raised at that time.

laws were meant to prevent. We also agree that Mahone's alleged injury does not satisfy this requirement. By focusing his complaint on monopolization, attempt to monopolize, and conspiracy to monopolize, Mahone appears to be asserting a violation of section 2 of the Sherman Act. *See* 15 U.S.C. § 2. Injury to competition is presumed to follow from the conduct proscribed by section 2; therefore, proving an injury to competition is not an element of a monopolization-based antitrust claim. *Walker v. U–Haul Co.*, 747 F.2d 1011, 1013 (5th Cir.1984) (on rehearing). Since Mahone would not have had to prove an injury to competition to prevail under section 2, it was unnecessary for him to support his section 2 claim with an allegation of competitive injury. However, Mahone is using his antitrust claim to recover actual and treble damages—damages which can only be recovered through a private civil suit brought pursuant to section 4 of the Clayton Act. *See* 15 U.S.C. § 15; *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 993 (5th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984).

Unlike section 2 of the Sherman Act, section 4 of the Clayton Act comes with a specific injury requirement. Explicitly, the section permits suits only by those persons "who shall be injured in [their] business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. As we have explained, however, "Congress did not intend to authorize every single person who can demonstrate the likelihood that he suffered some sort of economic injury as a result of such a per se antitrust violation to have a right of action for treble damages under § 4 of the Clayton Act." *Walker*, 747 F.2d at 1014. Therefore, we have recognized that under section 4 of the Clayton Act, antitrust plaintiffs

> must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect

either of the violation or of anticompetitive acts made possible by the violation. *Multiflex, Inc.*, 709 F.2d at 993–94 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)); *see also Walker*, 747 F.2d at 1014–15.

In pleading an antitrust claim for damages under section 4 of the Clayton Act, therefore, a plaintiff must allege, either directly or inferentially, that he has suffered an anticompetitive injury as a result of the defendants' antitrust violation. *Cf. Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985) (holding that to prove a Rule of Reason violation under section 1 of the Sherman Act, a plaintiff must allege an anticompetitive effect). Even after liberally construing the allegations in Mahone's complaint, as we must do, we cannot say that he has satisfied this pleading requirement. Mahone alleges that he initially applied for annexation because he wished to develop his twenty acre tract, or to sell it with the potential for development with municipal utilities available to it. He alleges that the defendants' failure to provide him with utilities was a result of an unlawful conspiracy to monopolize the commercial and residential development of land in the District's area for themselves. And finally, he alleges that he was forced to sell his twenty acre tract at a price lower than he would have received had the tract been permitted access to the District's utilities. At most, these allegations suggest that because of the defendants' actions, Mahone was unable to develop his tract of land and, therefore, to compete with the defendant developers. The antitrust laws, however, were designed to protect competition, not merely competitors. *Brunswick Corp.*, 429 U.S. at 488, 97 S.Ct. at 697.

Mahone does not allege that the defendants were the only developers in the District. In fact, his complaint shows that after the District declined to add Mahone's land, it annexed at least one other piece of property. Mahone does not allege that the owner of this newly annexed property was

one of the defendants, or that the owner joined in the conspiracy of which Mahone complains. Given that the District is composed of at least 600 acres, and that the tract of land Mahone owned was only twenty acres, we cannot assume that freezing out Mahone caused an anticompetitive injury to the District. Moreover, according to Mahone's complaint, he no longer even owns the twenty acre tract. Mahone's complaint does not reveal who purchased the land or if the new owner has also been refused annexation. Coupled with the fact that Mahone has failed to allege that any purchaser was forced to buy from the defendant developers at a price that was not the result of the competitive process, we conclude that these deficiencies in Mahone's complaint are fatal to his antitrust claim. In making the decision, we are mindful of the fact that the complaint we are reviewing has already been once amended, at the request of the district court. We hold, therefore, that the district court correctly dismissed Mahone's antitrust cause of action because his allegations failed to state a claim upon which relief could be granted.

■■■ Mahone's final argument is that even if his federal causes of action were insufficient to withstand a motion to dismiss pursuant to Rule 12(b)(6), the court's dismissal should have been without prejudice to his ability to pursue his state court claims without hinderance. We note that because we have remanded Mahone's equal protection claim for further consideration, Mahone's argument is now premature. However, if the district court determines on remand that Mahone's equal protection claim is also inadequate, the problem Mahone complains of will again arise. Consequently, it is appropriate for us to briefly address it now. *See Stallworth v. Monsanto Co.*, 558 F.2d 257, 268 (5th Cir. 1977). After considering the argument, we conclude that Mahone is correct. A dismissal with prejudice for failure to state a claim is a decision on the merits and essentially ends the plaintiff's lawsuit. *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir.1977). Consequently, the court's dismissal of Mahone's complaint in full could

cause problems of claim preclusion should Mahone attempt to assert his state-related causes of action in state court at a later date. However, neither we nor the district court has addressed the adequacy of Mahone's state-related claims. Consequently, if it determines on remand that Mahone's equal protection claim must also fail, the district court should dismiss with prejudice only Mahone's federal claims, thus permitting him the opportunity to raise his state claims in state court at a later time.

### IV.

### CONCLUSION

For the above described reasons, the judgment of the district court is AFFIRMED except as it relates to Mahone's equal protection claim. With respect to the equal protection claim, however, the court's judgment is REVERSED and the claim is REMANDED to the district court for further proceedings consistent with this opinion. Each party shall bear its own costs.